700 So.2d 735 (1997)
Edward INGLETON, Appellant,
v.
STATE of Florida, Appellee.
No. 96-187.
District Court of Appeal of Florida, Fifth District.
September 26, 1997.
Rehearing Denied October 29, 1997.
Daniel S. Ciener, Andy M. Fouche', Curtis N. Flajole, David J. Romett of Law Firm of Daniel S. Ciener, Merritt Island, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Ann M. Childs, Assistant *736 Attorney General, Daytona Beach, for Appellee.
GRIFFIN, Chief Judge.
Edward Ingleton appeals his convictions for first-degree felony murder, attempted sexual battery and grand theft of a motor vehicle. We affirm.
Wendy Prior, the victim, was a waitress at a restaurant named Wacky Wings. On Friday, September 10, 1993, sometime between 8 and 9 p.m., her friends Kim and Terry Marcum arrived at Wacky Wings. Ingleton, who had been friends with Terry for years, was also there, and the two of them left briefly for a trip to an apartment where Ingleton said he would purchase some marijuana. Terry never saw what Ingleton bought, but while they were at the apartment, Ingleton offered Terry what Terry thought was cocaine. Terry watched Ingleton ingest two lines of the powder-like substance. They then returned to Wacky Wings.
Wendy Prior finished her shift at Wacky Wings around 9:30 that evening. Still wearing the Wacky Wings tee shirt and the pair of shorts she wore to work, Prior met Kim and Terry and was introduced to Ingleton. While at the restaurant, Ingleton requested Terry to ask Prior if she would like to go with them back to Ingleton's motor home. Some drinking occurred, and the group temporarily split up around midnight. Prior and Kim stopped by a bar, saw a friend, had a beer, and then met up with Terry and Ingleton at the home of another Wacky Wings employee. Around 1 a.m., Kim invited Prior to go with her and Terry to Ingleton's motor home. They took two cars. Kim rode with Prior while Ingleton rode with Terry. Along the way, Ingleton remarked to Terry, "I sure would like to do her." When Terry responded, "Good luck," Ingleton replied, "Luck has nothing to do with it."
Once at the motor home, Terry left briefly to pick up some beer. When he returned, the other three were sitting around a table inside the motor home. They shared the beer and all four partook in smoking some marijuana. At approximately 3 a.m., Prior desired some cigarettes and all four rode in Terry's car to a nearby convenience store. Prior and Ingleton shared the back seat and together went in to buy the cigarettes. When they emerged, Terry and Kim offered to drive them back to the motor home, which was only a couple of blocks away, but they refused, with Prior saying she wanted to walk. Terry and Kim then left for the evening. The time was roughly between 3 and 4 a.m.
At 6:20 a.m., on September 11, 1993, Michael Joseph pulled up to the motor home to give Ingleton a ride to work. Ingleton's truck had been broken and Joseph, Ingleton's supervisor at the stucco company where they worked and a recent source of transportation, was expected. He spied a strange car (later identified as Prior's) parked near the motor home. As Joseph got out of the truck, Ingleton emerged from the motor home obviously not ready for work. He told Joseph that he had a girl inside who would give him a ride and that he would be at work by 8 a.m. Joseph then went to work without Ingleton.
At approximately 10 or 11 a.m. that day, Leonard Taylor, Ingleton's step-father, received a collect call from Ingleton. Ingleton asked for the phone number of his aunt in Michigan. Later that day, Ingleton's cousin in Michigan received a collect call from Ingleton. Ingleton told her that he was in Jacksonville and that he had killed two peoplethat he had stabbed Terry Marcum in the throat and that he killed Terry's girlfriend. He also told her that he had Terry and his girlfriend's car, that he wanted to get as far as Michigan to try to make it to "Canada or something," and that he would not go back alive.
Thereafter, Leonard Taylor received a second call, this time from his wife, Ingleton's mother. After speaking with her, Taylor contacted the Brevard County Sheriff's Department. At approximately 2:10 p.m., a deputy sheriff received a radio call concerning Ingleton's motor home. He located the motor home in a trailer park and knocked on its door. Receiving no answer, the deputy called the telephone number found on a sign in front of the motor home and reached Karen Seniura. Seniura's business was the *737 former owner of the motor home and, just a few days earlier, had sold it to Ingleton. Seniura still retained a key because of pending repair work. Using her key, Seniura entered the motor home and reported to the deputy that a person was lying in the bed at the rear of the vehicle, covered with a blanket. The deputy then entered the motor home, lifted the blanket and found Wendy Prior's body. She was naked from the waist down. On the bed were a sheet, a pair of shorts, an address book, two compacts, a pen, a tube of Blistex, a towel, a used tampon, a bottle of Vasoline Intensive Care and a second bottle which contained an oily substance.
Ingleton's mother also called Cliff Brown, a minister in Jonesboro, Georgia, who had known Ingleton since 1983 or 1984. Brown was given the phone number to a pay phone. When he called it, Ingleton answered. The time was approximately 4:30 p.m. Ingleton told Brown that he was going to see him and that he would be shocked by what Ingleton had to tell him. When Ingleton arrived, he told Brown that the night before he had broken the neck of a girl named Wendy and stabbed a guy named Terry. Ingleton and Brown discussed Ingleton's desire to commit suicide as well as Brown's desire that Ingleton turn himself in to the authorities. When Ingleton fell asleep in one of Brown's bedrooms, Brown made several phone calls to confirm whether such events had happened and to seek advice about what to do. Eventually he spoke with authorities in both Brevard County and Clayton County, Georgia. At approximately 10 p.m., Clayton County authorities entered Brown's home, woke Ingleton, and arrested him.
When arrested, Ingleton was observed to have cuts on both his hands. In response to an officer's comment that Ingleton might do something stupid on his way back to Florida, Ingleton stated, "Well, I think I've already done something stupid. You've been in the trailer, haven't you?"
Unquestionably, the primary feature of the trial concerned the cause of Wendy Prior's death. The state's first-degree premeditated murder charge was predicated on alternative theories of murder. One proposed that Prior had been asphyxiated, while the other held that Ingleton provided Prior with drugs which caused her death. The state presented witnesses who favored each theory.
A small but significant feature of the trial was the testimony of Jay Staggs. Staggs was an inmate at a federal prison camp in Georgia who had previously served time at the Brevard County jail. Staggs claimed to have met Ingleton while the two were incarcerated in Brevard County. Staggs testified that Ingleton told Staggs he attempted to overdose Prior on cocaine and "that didn't work." He also told Staggs he was angry with her because "she wouldn't give him a blow job" and that he had been choking her and thought he broke her neck.
Ingleton has raised multiple issues on appeal, only three of which merit discussion. Ingleton's core contention on appeal is that he was tried on a void indictmenta claim which requires some review of the prior history of the case.
A Brevard County grand jury returned an indictment against Ingleton on September 29,1993, two and one-half weeks after Prior's body was discovered. The indictment contained three counts: first-degree premeditated murder, sexual battery and grand theft of an automobile. The first of those counts read in pertinent part as follows:
EDWARD ROBERT INGLETON on the 11th day of September, 1993, in the County of Brevard, and State of Florida, did then and there unlawfully kill a human being, WENDY PRIOR, by STRANGLING WENDY PRIOR, and said killing was perpetrated by said EDWARD ROBERT INGLETON from a premeditated design or intent to effect the death of said WENDY PRIOR, contrary to Section 782.04(1)(a)1, Florida Statutes.
(Emphasis added). The state later nolle prossed the sexual battery count and filed an information charging Ingleton with attempted sexual battery. The state also subsequently determined to go forward on the alternative theory that Ingleton caused Prior's death by distributing to her a lethal dose of cocaine and thereby committed first-degree *738 premeditated murder under section 782.04, Florida Statutes (1993).[1]
Ingleton filed a motion to prevent the state from proceeding on the drug overdose theory. He argued that the grand jury indicted him under subsection 782.04(1)(a)1, not (1)(a)3, and that because the latter offense required proof of unalleged elements such as the facts of distribution and proximate causation, the state could not go forward with its theory. The trial judge agreed, and the motion was granted.
Also heard at the same hearing was a motion filed by the state to strike the language "by STRANGLING WENDY PRIOR" from the indictment. The state argued that the indicated language was superfluous, relying on Huene v. State, 570 So.2d 1031 (Fla. 1st DCA 1990), review denied, 581 So.2d 1308 (Fla.1991). The state argued that there would be no prejudice to the defense, since Ingleton was well aware the state's other theories about how Ingleton had effected Prior's death. The trial court granted the state's motion, but announced that such did not change the court's earlier ruling that the state could not proceed with the drug overdose theory.
The state immediately sought certiorari from this court requesting that the state be allowed to proceed with its drug overdose theory. This court granted the petition and issued the writ. State v. Ingleton, 653 So.2d 443 (Fla. 5th DCA), review denied, 659 So.2d 1087 (Fla.1995). The court framed the issue presented in this fashion:
The trial court's order in the instant case is based on the conclusion that the state charged the defendant with murder by strangulation and did not charge the defendant with killing the victim by unlawful delivery of a controlled substance. However, it should be noted that the trial court granted the state's motion to strike the language "by Strangling Wendy Prior" from the indictment. Therefore, the indictment charges the defendant with killing the victim simply by premeditated design. The question then becomes whether the unlawful killing of a human being which resulted from the unlawful distribution of a controlled substance, when such drug is the proximate cause of death, which is contained in subsection 3., differs in any substantial way with an unlawful killing resulting from the perpetration of one of the specified felonies contained in subsection 2.
Id. at 446. It was concluded that distributing a fatal dose of a controlled substance was the equivalent of the various offenses which support the felony-murder doctrine, and as a first-degree premeditated murder charge may be prosecuted as an uncharged first-degree felony murder, so may it be prosecuted as a cocaine overdose murder. Id. Ingleton had sought to prevent the issuance of the writ on the ground that the original language of the indictment, i.e. the "strangling" reference, controlled:
[T]he attempt by the state to include the different charge of death by distribution of a controlled substance unlawfully seeks to go outside of the crimes charged in the grand jury's indictment. The state may seek to strike or disregard mere surplusage and allegations which are unnecessary to the offense or may withdraw additional counts in the indictment to narrow the crimes charged without violating a defendant's right to be prosecuted pursuant to an indictment returned by a grand jury. However, the state may not seek to go *739 outside of the indictment by altering the contents so as to charge an additional or different offense from that found by the grand jury.
* * * * * *
In the instant case, then, the state is limited to trying the defendant only on the charge brought by the grand jury, premeditated murder (or, pursuant to Knight [v. State, 338 So.2d 201 (Fla.1976),] felony murder under Section 782.04(1)(a)2, Florida Statutes) "by strangling Wendy Prior."
Brief for Respondent at 8, State v. Ingleton, 653 So.2d 443 (Fla. 5th DCA 1995) (No. 94-2584) (emphasis in original) (citations omitted). As can be seen from the portion of the opinion quoted above, the court found the deletion to be effective. Thus, we conclude that the issue raised here represents the law of this case because it was necessarily decided adverse to Ingleton in the earlier appeal. Furthermore, we conclude it was decided correctly.
The rule is that where an unauthorized amendment is made to an indictment or information, the charging instrument is reduced to a nullity. State ex rel. Wentworth v. Coleman, 121 Fla. 13, 163 So. 316, 317 (1935). Generally, a conviction resulting from such an insufficient document is improper. Russell v. State, 349 So.2d 1224, 1226 (Fla. 2d DCA 1977), disapproved on other grounds, Tingley v. State, 549 So.2d 649 (Fla.1989); Lawson v. State, 251 So.2d 683, 684 (Fla. 3d DCA 1971). An alteration to a grand jury's indictment by the state or the court is permissible, however, if it does not relate to the document's substance. Pickeron v. State, 94 Fla. 268, 113 So. 707 (1927), overruled in part on other grounds, Tingley, 549 So.2d at 651. Similarly, it has been held that mere surplusage may be stricken from an indictment. Huene v. State, 570 So.2d at 1032.
Under Florida law, an amendment to an indictment that subjects an accused to the possibility of conviction for an offense not charged by a grand jury is impermissible. See, e.g., King v. State, 104 So.2d 730 (Fla. 1957); Long v. State, 92 So.2d 259, 260 (Fla. 1957); Wentworth; Brennan v. State, 651 So.2d 244, 245-46 (Fla. 3d DCA 1995); Rose v. State, 507 So.2d 630, 631-32 (Fla. 5th DCA 1987). However, a variance is fatal only if prejudicial. See, e.g., Cannon v. State, 91 Fla. 214, 220, 107 So. 360, 363 (1926); Marshall v. State, 381 So.2d 276, 278 (Fla. 5th DCA 1980); Sharp v. State, 328 So.2d 503, 504-05 (Fla. 3d DCA 1976); Howlett v. State, 260 So.2d 878, 880 (Fla. 4th DCA 1972); Fitzgerald v. State, 227 So.2d 45, 46 (Fla. 3d DCA 1969). An example is Grissom v. State, 405 So.2d 291 (Fla. 1st DCA 1981). The defendant there was charged with stealing a "cow," which is a female bovine, while the proofs at trial showed he had, in fact, stolen a male calf. The appellate court acknowledged that there had been a variance, but finding no prejudice, affirmed the conviction.
There are many Florida cases where deviations from facts alleged in a charging document were permitted on the basis that the changed facts were not essential elements of the charged offense. For example, in Mas v. State, 222 So.2d 250 (Fla. 3d DCA 1969), the defendant was charged with violating a statute which dealt with throwing a missile that could produce death or great bodily harm. The information charged that the particular missile he threw was a fire-bomb, but no such proof was adduced at trial. On appeal, the third district affirmed the conviction, holding:
The information contained the essential allegation that the missile thrown was one which would produce death or great bodily harm, and the additional language of `to-wit: a fire bomb' was surplusage and did not require proof that the missile had the particular ingredients of a fire bomb as set forth in the statute relating to possession of fire bombs.
Id. at 251. Similarly, the supreme court in L.S. v. State, 464 So.2d 1195 (Fla.1985), held that because a charge of burglary need not specify what particular felony an accused intended to commit, the state may take advantage of a statute providing for a presumption of the intent to commit a felony even where the charge alleged the intent to commit a particular felony. See also Urga v. State, 155 Fla. 86, 20 So.2d 685 (1944); *740 Thomas v. State, 183 So.2d 297, 299 (Fla. 3d DCA 1966).
The essential elements of the grand jury's first-degree murder charge against Ingleton were: first, that Wendy Prior was dead; second, that her death was caused by Ingleton; and third, that the action of causing her death was premeditated. See § 782.04(1), Fla. Stat.; Fla. Std. Jury Instr. (Crim.) 63; see also State v. Baker, 456 So.2d 419, 422 (Fla.1984). In this case, the state requested the court to remove the language "by strangling Wendy Prior" from the indictment in order to try Ingleton for first-degree murder on the theory that he caused Prior's death by some form of asphyxiation or by providing her with cocaine. Although some manner must be shown in order to prove the element of causation itself, the particular manner by which Ingleton allegedly killed Prior was not an essential element of the offense.[2] Because the state's alteration of its theory as to the cause of Prior's death produced a variance, and not an amendment, and no prejudice has been shown, we conclude the variance was not fatal.
Ingleton's next complains of four separate episodes of what he considers judicial misconduct. First, Ingleton contests the trial judge's comment to witness Jay Staggs during the defense's cross examination. Staggs had testified that he had been shown newspaper articles on Ingleton's case by the prosecutor, Mr. Respess, while he was in administrative confinement. He had earlier testified at a deposition that he did not remember who brought him the articles but thought it was someone housed at "pod A" of the jail but not in confinement. Then the following occurred:
A: January 31, I would agree that's what it says and that must have been what I testified to. Who was the other person? That could have been, it probably was Mr. Respess.
Q: Was Mr. Respess at that time in A pod? He was housed there but not locked down? That's what you said.
A: You are getting a little ridiculous, aren't you?
Q: No. Would you agree that the answer you gave would make it rather impossible?
A: Would it make you happy for me to address this jury and say to all of these nice people that I'm a damn liar. Would that make you happy? I don't know what I said back then. That was a year ago.
THE COURT: Mr. Staggs, what you need to do is wait until the question is posed and answer that question.
THE WITNESS: I understand, Your Honor, what you are saying. However, he is succeeding in trying to anger me. And that's exactly what he's doing.
THE COURT: I understand that, too.
THE WITNESS: You know he's doing it too. Thank you.
THE COURT: What you need to do is listen to the question and answer the question. Okay.
The second and third instances Ingleton questions involved the testimony of expert witnesses. Dr. Smedberg, the medical *741 examiner, had earlier testified concerning the time factor in asphyxiation situations:
Q: Now, how long would it take to effect death by the means that you observed in this case?
A: Usually when the trachea as well as the blood vessels of the neck that are adjacent to the trachea are compressed, generally one becomes unconscious within a range, it can range from thirty seconds to a minute. It depends on the individual. It depends on the condition of the individual. But, certainly as most of us know, the cardiac arrest and stopping breathing, anywhere between at the most three to five minutes. I would put five minutes at the very latest. Somewhere around three minutes.
Q: So
A: As far as death.
Q: So, three to five minutes?
A: Loss of consciousness may be earlier than that.
(Emphasis added). During the direct examination of Dr. Sperry, a defense expert, the following occurred:
Q: Are you aware of Dr. Smedberg's view as to how long it would take a person to become unconscious from strangulation?
A: As I recall, it was something on the order of several minutes as I recall, yes.
THE COURT: That's not what he said. That's not what he said.
* * * * * *
Q: In your review of his deposition, that's where you had gotten his view as to how long this would have taken, `is that right?
A: Yes. That's the only information at least the only transcribed information that I've ever read that he's generated.
Q: So, it would have been some misstatement of his if he said it was three to five minutes?
A: For unconsciousness?
Q: For unconsciousness.
THE COURT:`That's not what he said.
[DEFENSE ATTORNEY]: That's what he said in his deposition.
THE COURT: That's not what he said at trial. I don't know if you were given an opportunityit's hearsay. And I don't think he was afforded an opportunity to talk about that deposition. So, it's hearsay then. It's not authenticated. It's not part of the evidence of this cause.
Ingleton claims that the trial court erred by suggesting that the defense attorney was falsely stating the evidence. In fact, the defense attorney was attempting to impeach the state's expert through statements he allegedly made at a deposition that was not admitted as evidence. It would have been preferable if these questions had been objected to by the state, but, even in the absence of objection, the trial court must have some discretion to assure that the trial of a matter is based on evidence presented at trial. We find no reversible error in the court's conduct.
Finally, Ingleton makes several complaints about "prosecutorial misconduct" during closing argument. Mostly, these concern argument of facts not in evidence or the making of statements of personal opinion. After reviewing the record, we find no merit in the former and, after reviewing the statements, we find no error in the court's handling of the latter.
AFFIRMED.
PETERSON, J., concurs.
THOMPSON, J., concurs in result only.
NOTES
[1] Section 782.04, Florida Statutes (1993) states:

(1)(a) The unlawful killing of a human being:
1. When perpetrated from a premeditated design to effect the death of the person killed or any human being; or
2. When committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any:
* * * * * *
c. Sexual battery,
* * * * * *
or
3. Which resulted from the unlawful distribution of ... cocaine ... by a person 18 years of age or older, when such drug is proven to be the proximate cause of the death of the user. is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.
[2] This conclusion has support elsewhere in Florida law. Historically, grand juries have been instructed to include in murder indictments the manner and means by which the death was caused. Michael v. State, 40 Fla. 265, 23 So. 944, 945 (1898); Adams v. State, 28 Fla. 511, 10 So. 106, 108 (1891). It has also been held, however, that the indictment may state that such information is unknown to the grand jury when such is the case. Houston v. State, 50 Fla. 90, 39 So. 468, 469 (1905). Manner and means of death may, therefore, be said to be among those "matters of description not essential constituents of an offense, but which are required to be stated if known." Lang v. State, 42 Fla. 595, 598, 28 So. 856, 857 (1900). Further support may be gained from Sessions v. State, 82 Fla. 248, 89 So. 553 (1921), where the supreme court found no fatal variance when an indictment alleged the victim had been shot in "the body" but the proof showed the wound was suffered in the head. See also People v. Carter, 57 Ill.App.3d 84, 14 Ill.Dec. 814, 818, 372 N.E.2d 1093, 1097 (1978) (holding state is not required to prove identity of murder weapon and no material variance was created where state failed to prove alleged weapon, or any weapon, was used and defendant not prejudiced); Manna v. State, 440 N.E.2d 473 (Ind. 1982) (holding allegation of the weapon which caused death was surplusage and variance from allegation not fatal where no prejudice shown).