511 S.E.2d 469

**STATE of West Virginia, Appellee,**

**v.**

**Johnny RODOUSSAKIS, Appellant.**

No. 25170.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 12, 1998.

Decided Dec. 10, 1998.

W. Mark Burnette, Esq., Special Prosecuting Attorney, Lewisburg, West Virginia, Attorney for the State, and Fred J. Giggenbach, Law Student Assistant.

Barry L. Bruce, Esq., Barry L. Bruce & Associates, Lewisburg, West Virginia, and Franklin D. Cleckley, Esq., Morgantown, West Virginia, Attorneys for the Appellant.

MAYNARD, Justice:

The defendant below, appellant, Johnny Rodoussakis, was charged with felony murder in violation of W.Va.Code § 61–2–1 (1991) in the June 22, 1996 death of Randall Burge. Following a jury trial July 28, 1997 through July 31, 1997 in the Circuit Court of Raleigh County, West Virginia, the defendant was found guilty with no recommendation of mercy. Consequently, the defendant was sentenced to life in prison without the opportunity for parole. On appeal to this Court, the defendant assigns three errors seeking reversal of his conviction. For the reasons that follow, we affirm.

## I.

### FACTS

In the late morning hours of June 22, 1996, Randall Burge, a twenty-nine year old Greenbrier County resident, was found dead in the Lewisburg apartment of a friend. The police investigation of Burge's death resulted in the indictment of the defendant, Johnny Rodoussakis, for the felony murder of Burge.[1] Specifically, the State alleged that Burge died as a result of morphine that was delivered to him by the defendant a few hours prior to Burge's death. The defendant

filed a change of venue motion which was granted by the trial court. The defendant's trial, therefore, was held in the Circuit Court of Raleigh County.[2]

At the defendant's July 1997 trial, the State offered eighteen witnesses. These witnesses included Dr. Zia Sabet, the State's acting Chief Medical Examiner, who performed the autopsy on Burge pursuant to determining the cause of death, and Dr. Donell K. Cash, Chief Toxicologist for the Office of Chief Medical Examiner. Their testimony revealed that Burge's system contained a blood alcohol level of .09; .05 milligrams of total morphine, characterized as a lethal dose; and benzoyl ecgonine or "cocaine extract." Dr. Sabet testified that death was the result of multiple drug intoxication, and he stated that the first effective drug was morphine, the second alcohol, and the third cocaine. Dr. Sabet concluded that if the morphine were taken out of Burge's system, he would not have died when he did. The testimony of Dr. Elizabeth Scharman, Director of the West Virginia Poison Center, and Dr. Irvin M. Sopher, retired Chief Medical Examiner of the State concurred with this opinion.

Two other witnesses were Curtis Lee Cassey and Lawrence Graham. Cassey testified that he sold two or three bottles of morphine to Lawrence Graham on two or three separate occasions. In addition, he testified that after Burge's death, the defendant warned him, "I got some of your morphine and the morphine killed some guy. Keep your mouth shut. I'm not going down for you or anyone else." Finally, Cassey stated that the defendant attempted to purchase morphine from him indirectly through Graham. Lawrence Graham testified that he agreed to sell morphine for Cassey, and that he sold a total of six vials of morphine to the defendant on three separate occasions in June 1996. He stated, also, that after Burge's death, the defendant warned him to keep his mouth shut.

---

1. The defendant was originally also charged with the delivery of morphine. This count was dismissed by the trial court upon the defendant's motion.

2. The defendant's first trial began in the Circuit Court of Raleigh County in April 1997 and ended in a mistrial.

Steven Hutsenpiller testified that days before Burge's death, the defendant persuaded Hutsenpiller to purchase morphine at ten dollars an injection. According to Hutsenpiller, the defendant gave him morphine orally and injected him twice in the arm. Hutsenpiller stated that he became violently ill, thought that death was imminent, and begged to be taken to the hospital. The defendant refused Hutsenpiller's frantic pleas, however, and instead repeatedly requested that Hutsenpiller pay him for the morphine injections. Hutsenpiller admitted that there was a third offense DUI charge pending against him but asserted that the prosecution had made no promises to him concerning that charge in exchange for his testimony.

The State's key witness was Lana Poole who testified that on two occasions she chauffeured the defendant to meet with unknown persons for the purpose of purchasing morphine. She testified further that she witnessed the defendant inject Burge with morphine three times just hours before Burge died. According to Poole, Burge became ill after the second injection. Her attempt to prevent the defendant from injecting Burge the third time, however, was met with a harsh and profanity-laced rebuke from the defendant. On cross-examination, when asked whether she had phoned the defendant's mother and requested money in order to leave town before testifying, Poole asserted that the defendant's mother had phoned her and offered money for that purpose.

In addition, there was testimony that Burge was a happy and lighthearted person who occasionally indulged in a little beer and marijuana but who was never known to use morphine. Witnesses who had seen Burge the night before his death and prior to his encounter with the defendant testified that he appeared to be sober. Still other witnesses testified of experiences similar to those recounted by Hutsenpiller in which the defendant attempted to sell them injections of morphine.

The defense responded with sixteen witnesses of its own. The defendant's medical expert witnesses consisted of Dr. Anne Hooper, a physician who specializes in pathology; Dr. Stuart Boghema, a forensic toxicologist; and Dr. Kim Collins, Deputy Chief Medical Examiner of South Carolina. Dr. Hooper testified that Burge died of an acute overdose of cocaine. Dr. Boghema opined that it is "less than likely" that Burge died of a morphine overdose. According to Dr. Collins, Burge died of an acute heart attack possibly related to cocaine use.

The testimony of several defense witnesses differed significantly from the accounts of Hutsenpiller and Poole. Several witnesses testified that Hutsenpiller and Poole have a reputation in their communities for untruthfulness. There was testimony that on the night preceding his fateful meeting with the defendant, Burge was attempting to sell cocaine in Anderson's Bar in Ronceverte. April Kirk testified that Burge was "hooked on crack." Robin Stone declared that she ran into Burge at Anderson's Bar the night before he died. Burge was sweating profusely, and he explained that he had been "partying all day." According to Stone, Burge offered her morphine and she declined. Prior to leaving, however, she witnessed Burge inject himself with morphine. Finally, Jean Rodoussakis, the defendant's mother, testified that Poole called her and requested three to four thousand dollars to get out of town because she did not want to testify. According to Ms. Rodoussakis, Poole stated, "it will buy your son's freedom. He will walk. Without my testimony, they can't do a thing."

After his conviction of first degree murder, the defendant moved for a new trial pursuant to Rule 33 of the West Virginia Rules of Criminal Procedure. The defendant based this motion on insufficient evidence that morphine caused Burge's death. Also, the defendant argued that the trial court erred in not allowing the testimony of J. Michael Anderson, a lawyer, to impeach Hutsenpiller's claim that the State had offered no inducement for Hutsenpiller's testimony. At the same time, the defendant moved for a judgment of acquittal on the basis of insufficiency of the evidence. By order of September 8, 1997, the trial court denied both of these motions.

## II.

## DISCUSSION

In his appeal, the defendant raises several assignments of error: (1) the trial court erred in not granting a judgment of acquittal; (2) the trial court committed reversible error by excluding substantive and impeachment evidence; and (3) the trial court erred in refusing to give the defendant's requested instruction stating that Lawrence Graham and Curtis Lee Cassey were accessories before the fact.

## 1.

### *Insufficiency of the Evidence*

#### *A.*

*Applicability of the Felony Murder Statute*

■ The defendant raises two separate arguments regarding the failure of the State to prove its case against the defendant beyond a reasonable doubt. First, the defendant contends that the State's evidence was insufficient to trigger application of the felony murder statute. Specifically, the defendant asserts that the felony murder statute does not apply in drug overdose cases.

After carefully reviewing the record, we find that the defendant failed to raise this specific issue below. As noted above, the defendant's specific argument here is that the felony murder statute is not applicable to the facts of this case. At the end of the State's evidence, the defendant's counsel made a motion for acquittal based on the insufficiency of the evidence. Specifically, counsel stated:

> Defense would move—make a motion for acquittal, that the defense states that the State has not carried its burden in this case. And the key elements of this offense as alleged is that the State must prove beyond a reasonable doubt that Randall Burge died of morphine poisoning as delivered by Johnny Rodoussakis.
>
> The State has failed to meet its burden of proving that Randall Burge died of morphine, and that their expert witness, the pathologist who was the only person who is licensed and able to determine cause of death, clearly stated in his cross-examination that the cause of death was multiple intoxication as indicated by his—multiple drug intoxication as indicated by his report that he had filed. And therefore the State has not met its burden and we ask that this matter be acquitted.

The defendant also made a written post-trial motion for judgment of acquittal which was, again, based on insufficiency of the evidence. Specifically, the defendant argued that there was not sufficient proof that morphine caused Burge's death. At no time, however, did the defendant raise the argument that the felony murder statute does not apply to drug overdose cases.

■ It is axiomatic in this Court that,

> "To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace. . . . It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely."

*State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996). The trial court was never alerted to the defendant's argument concerning the applicability of the felony murder statute and, therefore, never had the opportunity to consider it. Normally, "[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syllabus Point 2, *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958). However, this is an issue of first impression in this Court. Also, it concerns the interpretation of a statute. Therefore, we deem it important to address this issue in order to clarify the law.

■ W.Va.Code § 61–2–1 (1991) states:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, ar-

son, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

This Court has long held that "[w]hen a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syllabus Point 1, *State ex rel. Fox v. Board of Trustees of the Policemen's Pension or Relief Fund of the City of Bluefield, et al.*, 148 W.Va. 369, 135 S.E.2d 262 (1964), *overruled on other grounds, Booth v. Sims*, 193 W.Va. 323, 456 S.E.2d 167 (1995). The language of W.Va.Code § 61–2–1 is clear and unambiguous. It states that murder in the commission of a felony offense of manufacturing or delivering a controlled substance as defined in W.Va.Code § 60A–4–401 et seq. is murder of the first degree. By using such straightforward language, the Legislature made its intent plain that W.Va.Code § 61–2–1 includes drug overdose cases.[3] Therefore, it is our duty to apply the statute.

We note also that the felony murder statutes of several states include death by drug overdose. *See e.g., Ingleton v. State*, 700 So.2d 735 (Fla.App.1997), *rev. denied*, 717 So.2d 532 (Fla.1998); *State v. Whitted*, 232 N.J.Super. 384, 389, 557 A.2d 327, 330 (N.J.Super.A.D.1989) (holding that New Jer-

sey's Comprehensive Drug Reform Act of 1986 "established a new first degree offense which would hold drug distributors strictly liable for any deaths proximately resulting from their illegal distribution activities, even if those deaths were due to accidental drug overdoses."); *Heacock v. Commonwealth*, 228 Va. 397, 323 S.E.2d 90 (Va.1984); and *Sheriff, Clark County v. Morris*, 99 Nev. 109, 659 P.2d 852 (1983) (in view of legislative intent behind murder and involuntary manslaughter statutes, the court recognized second-degree felony-murder rule in fact-specific context of case where defendant allegedly sold and participated in administration of drugs, leading to fatal overdose by recipient).

■ Therefore, in light of the clear and unambiguous language of W.Va.Code § 61–2–1 and the plain intent of the Legislature in enacting that statute, we hold that pursuant to W.Va.Code § 61–2–1 (1991), death resulting from an overdose of a controlled substance as defined in W.Va.Code § 60A–4–401 et seq. and occurring in the commission of or attempt to commit a felony offense of manufacturing or delivering such controlled substance, subjects the manufacturer or deliverer of the controlled substance to the felony murder rule. Accordingly, we find that W.Va.Code § 61–2–1 was properly applied in the instant case.

### B.

### Sufficiency of Evidence that Defendant Caused Burge's Death

■ Next, the defendant argues that there is no evidence showing whether the morphine which actually caused Burge's death was delivered to the victim by the defendant or was self-administered without the defendant's involvement. The defendant asserts that once Robin Stone testified that she witnessed Burge inject himself with morphine the night before he died, it was necessary for the State to offer expert evidence showing that the self-administered morphine did not cause or

---

3. The defendant argues that by using the word "murder" in W.Va.Code § 61–2–1, the Legislature intended that the felony murder rule apply only in cases of intentional death. However, this Court held in *State v. Young*, 173 W.Va. 1, 16–17, 311 S.E.2d 118, 134 (1983) that under the felony murder rule "where a homicide occurs in the course of, or as a result of, a separate, distinct felony, the felonious intent involved in the underlying felony may be transferred to supply the intent to kill necessary to characterize the homicide as murder." (Citations omitted.)

substantially contribute to Burge's death. Because the State failed to do this, the defendant states there was insufficient evidence to convict him.

Once again, the defendant failed to raise this specific issue below. As noted above, the defendant's motion for acquittal at the close of the State's case was based on his argument that the State did not meet its burden of proving that Burge died of morphine. The defendant's motion for a new trial and post-trial motion for judgment of acquittal were both partly based on the assertion that morphine was not the cause of Burge's death. The defendant's medical evidence was that the defendant died of either a cocaine overdose or a cocaine induced heart attack. Also, the defendant presented evidence that the night before his death, Burge was attempting to sell cocaine and appeared to be using cocaine. In the motion for judgment of acquittal, the defendant notes that "Robin Stone testified she saw Randall Burge inject himself with morphine near Anderson's Bar at Ronceverte, West Virginia, the night of his death" but completely fails to articulate what relevance this testimony has to his claim of insufficient evidence. In his brief to this Court, the defendant now "assumes for purposes of this assignment of error that the death was the result of morphine" but argues that there is insufficient proof that the defendant's morphine killed Burge.

■ This Court has stated that "[w]hen a party relies in the trial court upon a specific ground for relief or in defense, he is bound thereby, and will ordinarily be refused relief in the appellate court on any position inconsistent therewith." Syllabus Point 3, *Bush v. Ralphsnyder*, 100 W.Va. 464, 130 S.E. 807 (1925). Further, "[p]arties cannot elect to try their causes on one theory in the lower court, and, when defeated on that line, assume a different position in the appellate court." *Bush*, 100 W.Va. at 470, 130 S.E. at 809 (citation omitted). Below, the defendant sought relief through a judgment of acquittal on the ground that there was insufficient evidence that morphine caused Burge's death. The defendant now seeks relief on appeal by averring that there is insufficient

evidence that the defendant's morphine, rather than Burge's own morphine, caused Burge's death. In light of the testimony of Robin Stone, the defendant's surprise witness, the defendant could have presented the issue raised in his brief in his post-trial motion. Because he did not do this, this issue was never presented to the trial court. Accordingly, for the same reasons as those stated above, we deem this issued waived, and we decline to consider it.

## 2.

### *Exclusion of Substantive and Impeachment Evidence*

The defendant's second issue can be broken down into three separate matters: (1) Did the trial court err in excluding the testimony of Attorney J. Michael Anderson concerning Steven Hutsenpiller's inducement for testifying on behalf of the State? (2) Did the trial court err in excluding the video statement of Lana Poole made soon after Burge's death? and (3) Was the exclusion of an alleged audiotape of a telephone conversation between the defendant's mother and Lana Poole reversible error?

■ Because the defendant's second assignment of error concerns several instances of alleged error in the exclusion of evidence, this Court will review the trial court's rulings on these matters for an abuse of discretion. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are reviewed for an abuse of discretion." *State v. Blake*, 197 W.Va. 700, 705, 478 S.E.2d 550, 555 (1996) (citation omitted). Further,

Even when a trial court has abused its discretion by admitting or excluding evidence, the conviction must be affirmed unless a defendant can meet his or her burden of demonstrating that substantial rights were affected by the error. In other words, a conviction should not be reversed if we conclude the error was harmless or "unimportant in relation to everything else the jury considered on the issue in question." Instead, this Court will only overturn a conviction on eviden-

tiary grounds if the error had a substantial influence over the jury.

*Id.* (citations omitted).

## A.

### *Excluded testimony of Attorney J. Michael Anderson*

Steven Hutsenpiller testified for the State under W.Va. Rule of Evidence 404(b).[4] As noted above, he testified of an episode in which the defendant injected him with morphine and the defendant's callous behavior when Hutsenpiller became severely ill and desired medical attention. Both parties agree that Hutsenpiller's testimony was very effective. At the close of the direct examination, Hutsenpiller testified to the following:

> **State:** Steven, you got arrested for DUI on February 7th of this year, didn't you?
>
> **Hutsenpiller:** Yeah.
>
> **State:** At [sic] that would be your third offense DUI; is that correct?
>
> **Hutsenpiller:** Yes.
>
> **State:** And that's a felony; do you understand that?
>
> **Hutsenpiller:** Yes, sir.
>
> **State:** And that charge is still pending; right?
>
> **Hutsenpiller:** Yes, sir.
>
> **State:** Have I made any promises to you about what would happen to that charge if you testified here today?
>
> **Hutsenpiller:** No, sir, you have not.

On cross-examination, Hutsenpiller again denied the existence of any deal with the State and emphatically insisted that his testimony was motivated by humanitarian reasons.

In response, the defendant called as a witness J. Michael Anderson, the attorney whom Hutsenpiller contacted concerning the DUI charge, to testify that there was a deal between the State and Hutsenpiller. The trial court held an *in camera* hearing to determine the admissibility of Anderson's testimony. Anderson testified to the following in pertinent part:

> **Defense Counsel:** Mr. Anderson, to your knowledge did the State make a deal with Mr. Hutsenpiller to testify?
>
> **Anderson:** Yes, sir—well, to testify?
>
> **Defense Counsel:** Yes.
>
> **Anderson:** They made a—they made a—they made a deal, but it was to—it was to cooperate.
>
> **Court:** What was it?
>
> **Anderson:** That they would not seek the third offense DUI felony if he would cooperate. It would be some type of misdemeanor. The specifics of which—what misdemeanor was not known to the prosecutor at that time because he didn't know if there had been any serious injury to the individual who was in the car accident which resulted in the third offense DUI. But there was no question in my mind that—that there was that understanding.
>
> **Court:** I guess the next question—and you have the right to invoke the privilege. Did you communicate that to him? And the reason that privilege becomes important—because of the testimony of Mr. Hutsenpiller.
>
> **Anderson:** I would have to invoke that privilege, but state that he was present when that conversation took place with Mr. Burnette.
>
> **Court:** Well, I think he can testify as to what he just said, in that Hutsenpiller was there when the conversation took place. It is—
>
> **State:** Judge, is he saying that—that Hutsenpiller listened in on that conversation? I can't tell from his answer.
>
> **Court:** That was my understanding.
>
> **State:** Was it on a speaker phone?

---

4. Rule 404(b) provides:

> *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**Anderson:** No, no. No, no. It was—it was not on a speaker phone. It was my conversation with [prosecuting attorney] Burnette. Mr. Hutsenpiller was in the room. And—and then I had further conversation with Mr. Hutsenpiller after I finished talking to Mr. Burnette.

The trial court appears to have excluded Anderson's testimony because it found that Anderson's alleged telephone conversation with the prosecuting attorney was not relevant as to whether Hutsenpiller had any understanding of an inducement from the State to testify. Further, because of Anderson's refusal to testify concerning any conversation he had with Hutsenpiller, the trial court found there was insufficient evidence to show that Hutsenpiller was made aware of any inducement from the State. The trial court concluded that any testimony offered by Anderson would not impeach Hutsenpiller's testimony.

The defendant asserts that the trial court's exclusion of Anderson's testimony is reversible error for essentially three reasons. First, the defendant contends that the testimony he sought to elicit from Anderson is not protected by privilege because the testimony related solely to whether Anderson had advised Hutsenpiller of the offer made by the State. *Citing United States v. Clemons,* 676 F.2d 124, 125 (5th Cir.1982) ("[a]n attorney's message to his client concerning the date of trial is not a privileged communication"); *United States v. Freeman,* 519 F.2d 67 (9th Cir.1975) (finding no attorney-client privilege where the attorney had advised the client of the court's order to appear); and *United States v. Kendrick,* 331 F.2d 110, 113 (4th Cir.1964) ("[c]ommunications made in confidence by a client to his attorney are protected by the attorney-client privilege. It is the substance of the communications which is protected, however, not the fact that there have been communications."). Second, the defendant asserts that even if privilege exists under these facts, it is waived by the "fairness doctrine." Basically, the defendant avers that when Hutsenpiller testified that there was no inducement, testimony which otherwise would have been privileged, he waived his right to assert attorney-client privilege as to other communications with his

attorney. *Citing Smith v. Alyeska Pipeline Serv. Co.,* 538 F.Supp. 977, 979 (D.Del.1982), *aff'd,* 758 F.2d 668 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2142, 85 L.Ed.2d 499 (1985) ("A client . . . may waive the privilege by deliberately injecting into the case the advice which he received from his attorney" (citations omitted).); and *In re von Bulow,* 828 F.2d 94 (2d Cir.1987). Last, the defendant contends that the trial court was wrong as to the facts when it held that Hutsenpiller had not testified to anything that could be impeached by Anderson's testimony. According to the defendant, Anderson's testimony would have been a direct contradiction of Hutsenpiller's claim that no offer of a deal had been made.

 The venerable attorney-client privilege "has as its principal object the promotion of full and frank discourse between attorney and client so as to insure sound legal advice or advocacy." Syllabus Point 11, in part, *Marano v. Holland,* 179 W.Va. 156, 366 S.E.2d 117 (1988). "Thus, confidential communications made by a client or an attorney to one another are protected by the attorney-client privilege." *State ex rel. United Hosp. v. Bedell,* 199 W.Va. 316, 326, 484 S.E.2d 199, 209 (1997) (footnote and citation omitted).

In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from the attorney in his capacity as a legal advisor; (3) the communication between the attorney and client must be intended to be confidential.

Syllabus Point 2, *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979).

 The defendant does not dispute the presence of these three criteria in the instant case. Rather, the issue is grounded upon whether the proffered testimony of Attorney Anderson consists of a privileged *communication* or the mere fact that a communication occurred. As noted by the defendant, "[i]t is the substance of the communication that is protected and not the fact that there have been communications or the attorney's obser-

vations of the client's physical characteristics such as his demeanor, bearing, sobriety or dress." *Scott v. Scott,* 106 N.C.App. 606, 612, 417 S.E.2d 818, 822 (1992), *aff'd,* 336 N.C. 284, 442 S.E.2d 493 (1994) (citations omitted). The general rule states that "[a] party may refuse on the ground of privilege to state whether he communicated certain facts to his attorney [or vice versa], but the fact that the attorney communicated with his client, and the date of such communication, are not privileged." 97 C.J.S. Witnesses § 283, p. 804 (1957).

In applying the foregoing distinction, it has been held that,

> Communications between an attorney and his client are privileged, and hence the contents of a letter written by an attorney to his client is privileged. However, neither the fact that the attorney communicated with his client, nor that subsequently the client acted under advice of counsel, nor the date that the attorney communicated with such client, is excluded by reason of privilege. Consequently the postmark on the envelope which contained the letter from attorney to client, or the date of the letter itself, is admissible for the purpose of showing the day on which the communication was mailed and received.

Syllabus Point 1, in part, *Rylee v. Bank of Statham,* 7 Ga.App. 489, 67 S.E. 383 (1910). In *United States v. Bostic,* 206 F.Supp. 855 (D.D.C.1962), *aff'd, Bostic v. U.S.,* 317 F.2d 143 (D.C.Cir.1963), the court held that the testimony of the defendant's attorney at the defendant's lunacy inquisition that he was able to confer with the defendant during trial and prepare a defense from the information conveyed to him by the defendant was not barred by the attorney-client privilege. *See also, United States v. Kendrick, supra.* In *United States v. Bourassa,* 411 F.2d 69 (10th Cir.1969), *cert. denied, Bourassa v. U.S.,* 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969), the court held that the attorney-client privilege was not violated when the defendant's former attorney testified at the defendant's bail-jumping hearing that he notified the defendant to be present for his first trial. Similarly, in *United States v. Hall,* 346 F.2d 875 (2d Cir.1965), *cert. denied, Hall v. U.S.,* 382

U.S. 910, 86 S.Ct. 250, 15 L.Ed.2d 161 (1965), the court found that the defendant's attorney's testimony that he informed the defendant that his presence in court was required on every occasion his case appeared on the calendar was not barred by attorney-client privilege. The court stated,

> We find no invasion of the attorney-client privilege resulting from Mr. Londin's formal testimony that he conveyed to his client the Assistant United States Attorney's routine message that the accused's presence was required at each calender call. The relaying of this message is not in the nature of a confidential communication. Defense counsel served merely as a conduit for transmission of a message.

*Hall,* 346 F.2d at 882. *See also, United States v. Clemons, supra, and United States v. Freeman, supra.*

More relevant to the instant case is *Barnes v. State,* 460 So.2d 126 (Miss.1984). There, the defendant sought to offer evidence that the State's chief witness had agreed to testify in exchange for not being prosecuted on several pending charges. When the defendant called the witness's attorney to testify to such an agreement, however, the State objected on hearsay grounds, and the objection was sustained by the trial court. The trial record appeared to indicate that the testimony was excluded on either the basis of hearsay or because of the attorney-client privilege. The court found that the testimony was improperly excluded on either basis. Concerning the attorney-client privilege, the court found that the witness "had stated in open court and quite unequivocally that he waived any right he might have under the attorney-client privilege to prevent his attorney ... from testifying in the premises." *Barnes,* 460 So.2d at 129. The court explained:

> Only the client may invoke the privilege. Once the client has effectively waived the privilege, the attorney is competent as a witness regarding matters otherwise within the scope of the privilege. The attorney has no standing to invoke the privilege if the client does not wish to.

The point is made by contrasting *Young v. State,* 425 So.2d 1022, 1028 (Miss.1983)

with the case at bar. The facts of the two cases are on this issue legally identical except that in *Young* the co-felon-turned-state's-evidence did *not* waive the privilege. *Young* quite correctly excluded the proffered testimony of the attorney regarding a leniency/immunity agreement. Because [the State's witness] waived the privilege, the opposite result obtains here.

*Id.*, 460 So.2d at 131.

We also find instructive the case of *Morris v. Courts*, 59 Ga.App. 666, 1 S.E.2d 687 (1939) in which the appellant complained that,

the court erred in refusing to permit counsel for the plaintiff to ask the defendant ... the following question: "Have you ever had occasion to confer with your attorneys regarding the legal effect of the power of attorney that you spoke of having seen that the American Bond & Share Corporation was using?"

*Morris*, 59 Ga.App. at 674–675, 1 S.E.2d at 693. The court explained,

It is contended that its exclusion was prejudicial, in that it tended to deprive the plaintiff of proof that the witness was aware of the contents of the document in question, having conferred with his attorney regarding it. The question was immaterial and idle, because it would not have been proper to elicit by a subsequent question the nature of the conversation between client and attorney, and a mere answer that a conference had taken place would not afford any evidence of the witness' knowledge of the contents or meaning of any document.

*Id.*, 59 Ga.App. at 675, 1 S.E.2d at 693.

█ Examining the facts of the present case in light of these principles, we are unable to conclude that the trial court erred in excluding the testimony of Hutsenpiller's attorney. Attorney Anderson's testimony was offered in order to impeach Hutsenpiller's adamant denial of any agreement with the State. For this testimony to be relevant, however, the mere fact that Attorney Anderson communicated with Hutsenpiller shortly after a phone call from Prosecutor Burnette does not suffice. Rather, the substance of any communication between Attorney Anderson and Hutsenpiller is necessary for the fact of the existence of the communication to be relevant. The substance of the communication and not merely the fact that a communication occurred is at issue here. This distinguishes the present case from those cited to us by the defendant. Any communication between Attorney Anderson and Hutsenpiller concerning the specific terms of an alleged proposed offer differs fundamentally from an attorney's message to his client relaying the date of a trial or the contents of a court order. In communicating the specific terms of an offer, an attorney informs his client of the offer as the attorney understands it. There are a number of factors and considerations involved in any proposed agreement. It is the role of an attorney to interpret the proposed agreement, explain it to his client, and counsel his client on the proper path to take. In this capacity, the attorney acts not as a mere messenger or "conduit," but in a role that defines the heart of the attorney-client privilege, that of learned and confidential advisor. We conclude, therefore, that the proffered testimony of Attorney Anderson included privileged communications with his client and was properly excluded by the trial court.

█ Further, we are not persuaded by the defendant's argument that Hutsenpiller waived the attorney-client privilege by testifying that there was no agreement with the State. Hutsenpiller did not testify of any conversations he had with Attorney Anderson or any advice he received from him. He did not deny any conversations allegedly engaged in between Prosecutor Burnette and Attorney Anderson concerning the offer of a deal. The fact of the existence or nonexistence of an agreement with the State, merely because such agreement may have been discussed in confidential communications with one's attorney, does not render the fact itself privileged. Therefore, when Hutsenpiller denied the existence of an agreement, he was not divulging privileged information. Accordingly, we conclude that any privileged conversations between Hutsenpiller and his attorney concerning an agreement with the State were not waived by the "fairness doctrine."

■ Finally, we find that the trial court did not err when it held that Hutsenpiller did not testify to anything that could be impeached by Attorney Anderson's testimony. Hutsenpiller's testimony was simply that the prosecutor had made no promise to him concerning his third offense DUI charge in exchange for his testimony. Attorney Anderson testified *in camera* to a conversation with the prosecutor concerning Anderson's understanding that if Hutsenpiller would cooperate, the State would not seek a third offense DUI felony conviction. The alleged conversation between Prosecutor Burnette and Attorney Anderson, as recounted during the *in camera* hearing, was general and somewhat vague. Absent Attorney Anderson's testimony concerning the specifics of any conversation he may have had with Hutsenpiller, we cannot conclude that the trial court abused its discretion in excluding the testimony of Attorney Anderson's conversation with Prosecutor Burnette. We conclude, therefore, that the trial court did not err in excluding the testimony of Attorney Anderson.

## B.

### Exclusion of Lana Poole's Videotaped Testimony

■ The defendant sets forth three grounds for the admission, in its entirety, of the videotaped statement given by Lana Poole to Sergeant Michael Spradlin of the West Virginia State Police in June 1996. First, the defendant contends that the videotape was admissible under Rule 612 of the West Virginia Rules of Evidence,[5] in order to refresh Poole's recollection on cross-examination. The defendant avers that the proper basis for admission of the videotape was Poole's testimony on cross-examination that she could not recall critical areas of testimony which appear on the videotape. Therefore, says the defendant, the videotape should have been played during the trial in order to refresh Poole's memory.

We disagree. While Rule 612 provides for the use of documents or objects in order to refresh a witness' memory, it does not provide that the document or object be read or shown to the jury. *See* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* Vol. 1, § 6–12(E) (3rd ed.1994). Concerning refreshing a witness' recollection, this Court has explained:

> The witness, in proceeding to testify from a present or existing recollection, may be unable to do so by unaided mental effort, but by resort to some memorandum or writing, his memory may be so stimulated and refreshed as to enable him to recollect the fact, and where this is so, it is not proper to introduce the writing in evidence, or read it in the presence of the jury, because it forms no part of the testimony, being used only for the purpose of

5. Rule 612, "Writing or object used to refresh memory," states:

 (a) *While testifying.*—If, while testifying, a witness uses a writing or object to refresh memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying.

 (b) *Before testifying.*—If, before testifying, a witness uses a writing or object to refresh memory for the purpose of testifying and the court in its discretion determines that the interests of justice so require, an adverse party is entitled to have the writing or object produced, if practicable, at the trial, hearing, or deposition in which the witness is testifying.

 (c) *Terms and conditions of production and use.*—A party entitled to have a writing or object produced under this rule is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

 If production of the writing or object at the trial, hearing, or deposition is impracticable, the court may order it made available for inspection. If it is claimed that the writing or object contains matters not related to the subject matter of the testimony, the court shall examine the writing or object *in camera,* excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing or object is not produced, made available for inspection, or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

aiding the mental effort of the witness to recollect the particular transaction.

*State v. Legg,* 59 W.Va. 315, 322, 53 S.E. 545, 548 (1906).[6] The one recognized exception to the above rule is when an adverse party of the witness seeks to have the writing or object introduced into evidence.

'[I]t is not the memorandum that is the evidence, but the recollection of the witness,' the party whose witness uses it has no right to have it read or handed to the jury; it is only the opponent who wishes to do this in case he wishes to cast doubt on the reality of the refreshment of memory.

*Id.,* (citation omitted). This is in accord with Rule 612(a). Rule 612(c) requires that if a claim is made that the writing or object contains matters not related to the subject matter of the testimony, and the trial court so finds, the unrelated portions of the writing or object shall be excised and only the related portions introduced in evidence.

In the instant case, the trial court adhered to the requirements of Rule 612(c). When the State objected to the playing of the videotape in its entirety, the trial court instructed counsel for the defendant to play only those portions of the videotape that were relevant to specific questions he had asked the witness on cross-examination. Because he had not previously edited the videotape nor prepared a written transcript of it, defendant's counsel was unable to do this. That defendant's counsel was prohibited from playing the entire videotape for the jury in order to refresh Poole's recollection is consis-

tent with Rule 612. That he was unable to play selected portions of the videotape is not the fault of the trial court. Therefore, we find that the trial court did not abuse its discretion.

■ Second, the defendant maintains that the entire videotape should have been admitted as substantive evidence because Poole incorporated the videotaped statement into her trial testimony by admitting that her recollection in June 1996, when the statement was given, was better than it was at the July 1997 trial.[7] According to the defendant, "[t]hroughout her testimony Poole indicated that she could not remember the content of her video statement; therefore, it became imperative for the jury to see and hear the video tape as substantive evidence." The defendant concludes that "[t]he video tape statement by [Poole's] own admission was more accurate and more reliable than testimony she may have given at trial."

The defendant cites no authority for the legal theory advanced here. We, likewise, are unaware of any provision in our case law or rules of evidence for the admission of the entire videotaped statement at issue under the specific circumstances of this case. As explained above, Rule 612 of the Rules of Evidence provides for admission of relevant portions of the videotape in order to refresh the witness' recollection. Rule 613(b) provides for the admission of a videotaped statement which is inconsistent with the witness' in-court testimony.[8] Finally, Rule

---

**6.** *State v. Legg* was decided long before the West Virginia Rules of Evidence were adopted. However, the rule concerning refreshed recollection explained in *Legg* is not inconsistent with Rule 612. Therefore, *Legg* remains a "source of guidance" on evidentiary matters. *Reed v. Wimmer,* 195 W.Va. 199, 205, 465 S.E.2d 199, 205 (1995).

**7.** Specifically, the defendant points to the following testimony of Poole on cross-examination:

Q: Do you recall in your video statement to Sergeant Spradlin that you heard Randall Burge say when you picked him up at the Kroger parking lot that he had just spent $125 on crack cocaine and was not finished partying yet?
A: If its on the video, then I would imagine I said that.
Q: So it's your testimony you did say that?
A: If it's on the video.

Q: Do you recall whether it's on the video?
A: I don't recall what's on there now. I told you, it's been over a year. I gave Sergeant Spradlin a video statement to the best of my knowledge what I could remember and put it exactly the way it happened. I tried my best—
Q: Well—
A: —to give him the information according to the way things happened.
Q: Well, you would agree, would you not, ma'am, that your memory, as you indicated here already, probably was much better as to these events—concerning these events in June of last year than it is today, wouldn't you?
A: Probably would've been better then, yes.

**8.** Rule 613 of the West Virginia Rules of Evidence, "Prior statements of witnesses" states:

(a) *Examining witness concerning prior statement.*—In examining a witness concerning a

803(5)[9] provides for the admission of recorded recollections. The defendant never sought the admission of the videotaped statement on Rule 803(5) grounds. The trial court complied with Rules 612 and 613(b) by allowing relevant selected portions of the videotape to be played. Beyond this, there is no ground in law or reason for the admission of the entire videotaped statement. It is undisputed that an out-of-court statement which was not under oath and not subject to cross-examination is less reliable than live testimony.[10] There was certainly no necessity for the admission of the videotape. Lana Poole testified and was questioned thoroughly by both the State and defense counsel. If Poole did make statements at trial which were inconsistent with the videotaped statement, the defendant had the means to impeach her testimony. The videotape was in the possession of defense counsel. He could have excised the inadmissible portions of the videotape or made a transcript of the videotape in anticipation of the necessity of impeachment. Instead, the defendant now asks this Court to find that the he should have been allowed to play an entire videotaped statement, some, if not most, of which is duplicative of in-court testimony. This we must decline to do.

■ Finally, the defendant claims that the trial court erred in not allowing the admission of the entire videotaped statement to show prior inconsistent statements of Poole for impeachment purposes. The defendant opines that the admission of the entire videotaped statement was necessary in order to show the jury not only the inconsistent statements made on the videotape but also to show what was not on the videotape but which was testified to at trial. According to the defendant, these inconsistencies in testimony constituted material issues of fact in the trial. The defendant concludes that because Poole was the only witness that placed the defendant with the victim and allegedly saw the defendant inject the victim with morphine, a proper impeachment of her testimony was crucial to the defense.

■ In *State v. King,* 183 W.Va. 440, 396 S.E.2d 402 (1990), this Court held that it was not error for the trial court to admit an entire videotaped statement under Rule 613(b) to impeach a witness' testimony at trial. There, the daughter of a defendant charged with incest testified in a videotaped statement made to a State Trooper that she and her sisters had sexual intercourse with her father. During the trial, however, she was called as a defense witness during the defendant's case-in-chief and testified on direct examination that she had previously lied about her father having sex with her because, among other things, she was afraid of the State Trooper and claimed that he coerced her into stating that her father had sex with her. The State was allowed to play the entire videotape to the jury to support its contention that the witness was not coerced by the State Trooper and to rebut the witness' testimony that she previously lied, by showing that she was credible at the time she spoke with the State Trooper. In affirming the trial court, this Court stated:

> A videotaped interview containing a prior inconsistent statement of a witness who

prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.
 (b) *Extrinsic evidence of prior inconsistent statement of witness.*—Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

9. Rule 803(5) provides:
 Recorded recollection.—A memorandum or record concerning a matter about which a

witness once had knowledge but now has insufficient recollection to enable him or her to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

10. We do not dispute that there are circumstances when a prior inconsistent statement will have an advantage over trial testimony. *See State v. King,* 183 W.Va. 440, 396 S.E.2d 402 (1990). However, we do not believe that such circumstances exist here.

claims to have been under duress when making such statement or coerced into making such statement is admissible into evidence if: (1) the contents thereon will assist the jury in deciding the witness' credibility with respect to whether the witness was under duress when making such statement or coerced into making such statement; (2) the trial court instructs the jury that the videotaped interview is to be considered only for purposes of deciding the witness' credibility on the issue of duress or coercion and not as substantive evidence; and (3) the probative value of the videotaped interview is not outweighed by the danger of unfair prejudice.

Syllabus Point 2, *Id. See also, State v. Schoolcraft*, 183 W.Va. 579, 396 S.E.2d 760 (1990).

The circumstances in *King* are different from those in the case *sub judice*. In *King*, the issue of whether the witness was under duress during the initial statement made the playing of the entire videotape necessary so that the jurors could view for themselves the witness' demeanor on the videotape. In the instant case, there are no allegations of duress or coercion during Poole's initial statement. The playing of the entire videotape in this case would be solely for the purpose of impeaching Poole's testimony at trial with previous inconsistent statements. As stated above, defense counsel could have impeached Poole with the discrepancies in her two accounts without playing the entire videotape. In his brief to this Court, the defendant lists two specific instances where Poole's videotaped statement and her in-court testimony diverged. Again, Poole could have been confronted with these inconsistencies at trial in the manner prescribed by the trial court.

 This Court has stated that,

Three requirements must be satisfied before admission at trial of a prior inconsistent statement allegedly made by a witness: (1) The statement actually must be inconsistent, but there is no requirement that the statement be diametrically opposed; (2) if the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b) of the West Virginia Rules of Evidence—notice and an opportunity to explain or deny—must be met; and, finally, (3) the jury must be instructed that the evidence is admissible only to impeach the witness and not as evidence of a material fact.

Syllabus Point 1, *State v. Blake*, 197 W.Va. 700, 478 S.E.2d 550 (1996). It appears from the record that the trial court adhered to these requirements in excluding the playing of the entire videotape. The defendant characterizes Poole's videotaped statement as a significant departure from her in-court testimony. The State, on the other hand, states that the videotape was almost entirely consistent with the in-court testimony. The trial court witnessed both the videotaped statement and the in-court testimony and, therefore, was able to accurately determine whether the entire videotape should be admitted or only select portions under the requirements set forth above. In explaining its ruling to defense counsel, the trial court stated:

The proper way to [admit the videotape] is one of three ways. And you say now that you want to do it to refresh her recollection. Earlier this morning, it was to impeach. But in any event, if it—the tape is used, the question has to be asked, and then the tape played. And [Poole] has an opportunity to respond. That wasn't done. That's what I told you this morning. Find out which areas where you're going to seek to impeach. And do it so it can be shown. And then impeach.

The other way to do it would've been a transcript. If the Defendant is prejudiced because that wasn't done—I suggested that at the last trial, that's the proper way to do it. If the Defendant is prejudiced, it's because his lawyers failed to pay attention.

The other way it could be done, still can be done, would be to call the police officer who took the statement and ask him if she

made the statement.[11]

The trial court's instructions were in line with the requirements of Rule 613(b). Further, the defendant had ample opportunity to impeach Poole concerning her prior inconsistent statements. Finally, "[a] trial court is afforded wide discretion in determining the admissibility of videotapes and motion pictures." Syllabus Point 1, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986); Syllabus Point 1, *State v. King*, 183 W.Va. 440, 396 S.E.2d 402 (1990). Accordingly, we find that the trial court did not abuse its discretion in excluding the videotaped statement of Lana Poole in its entirety.

### C.

#### Exclusion of alleged audiotape of telephone conversation

■ In response to questions from defense counsel on cross-examination, Poole denied calling the defendant's mother and requesting money in order to leave town before the trial.[12] Poole testified instead that the defendant's mother had called her and offered her money. The following day, during the defendant's case-in-chief, the defendant sought to play an audiotape of an alleged telephone conversation between Poole and Jean Rodoussakis, the defendant's mother, in which Poole requested money from Ms. Rodoussakis in exchange for leaving town and being unavailable to testify. The trial court excluded the audiotape because its disclosure was not timely and because the requirements of Rule 613(b) had not been met.[13]

The defendant claims that the exclusion of the audiotape constitutes reversible error. The defendant essentially argues that the requirements of Rule 613(b) were complied with because "[t]he witness was given every opportunity to deny making the statement and indeed she did." In support of his argument, the defendant again cites *State v. King*, *supra*. In *King*, after the daughter of the defendant denied, during the defendant's case-in-chief, that the defendant had sexual intercourse with her, the State was permitted to admit into evidence, during its rebuttal, the witness' videotaped statement to the contrary. The defendant quotes this Court's statement in *King* that "this case presents an instance where a witness' prior inconsistent statements do possess a unique advantage over her testimony during the trial in that it allowed the jury to decide the issue of the witness' credibility on two occasions, both of which the jury was able to observe." *Citing, inter alia, King*, 183 W.Va. at 446, 396 S.E.2d at 408.

A review of the record reveals that one of the grounds for the trial court's exclusion of the audiotape was that Poole, at the time of her cross-examination, was never informed of the existence of the audiotape, and, therefore, never had an opportunity to respond to it. We agree with the trial court. Rule 613(b) clearly provides, in part, that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible *unless the witness is afforded an opportunity to explain or deny the same.*" Because Poole was not made aware of the existence of the

---

11. The defendant conducted direct and cross-examination of the officer who took the statement. On direct, the defendant played excerpts of the videotape in question before the jury.

12. The following exchange occurred between Poole and defense counsel on cross-examination:
Q: Did you ever telephone Jean Rodoussakis—
A: Absolutely not, but she telephoned me.
Q: —and ask her to give you money to move to Richmond, Virginia?
A: No sir. She called me.
Q: Did you ever ask her for money to go to Richmond, Virginia so you did not have to testify here today?
[State]: Your Honor, asked and answered. She said no two or three times.

The Witness: Sir, she called—Ms. Rodoussakis called me. And Jean has never called me, ever, as long as I've known Johnny, Terry, the whole family, since I was married to Danny. She called me. She said, so I hear you're moving to Richmond after the trial. And she offered me money.
Q: That's your statement?
A: And—yes. That is my statement. And I told her, yes, I'm planning to move to Richmond after the trial because my life has been threatened ever since this started. My children have been—their lives have been threatened. I'm still being threatened.

13. Ms. Rodoussakis later testified that Poole called her and made the offer of leaving town prior to trial in exchange for money.

audiotape, she had no opportunity to explain its contents. As the trial court suggested, Poole might have made any of several plausible explanations for the audiotape's existence including an assertion that the audiotape was a fabrication. She may have denied that it was her voice on the audiotape. However, because the defendant did not disclose the existence of the audiotape until the day after Poole testified, she would not have had the opportunity to offer any of these explanations. This is contrary to the requirement of Rule 613(b). Finally, we believe that *King* is of no assistance to the defendant here. In *King*, the witness was aware of the videotaped statement during her testimony and even offered an explanation as to why that statement contradicted her in-court testimony. The videotape was admitted so that the jury could test the validity of the witness' explanation. We find, therefore, that the trial court did not abuse its discretion in excluding the audiotape.[14]

### 3.

### *Trial court's refusal to give requested jury instructions*

■ The final issue raised by the defendant is the trial court's refusal to give the defendant's requested jury instruction stating that Lawrence Graham and Curtis Cassey were accessories before the fact.[15] The defendant emphasizes the importance of Graham's and Cassey's testimony to the State's case and opines that "[t]he importance of the instructions would have been to notify the jury that great care and caution should be given to their testimony because of their role as an accessory and/or accomplice." According to the defendant, the proffered instruc-

tion was a correct statement of the law, was not covered in any other charge given the jury, and concerned a material issue so that its refusal constitutes reversible error. *Citing State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994); *State v. Satterfield*, 193 W.Va. 503, 457 S.E.2d 440 (1995); and *State v. Crabtree*, 198 W.Va. 620, 482 S.E.2d 605 (1996).

■ This Court has stated,

A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Syllabus Point 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). Further, "a trial court can refuse an instruction not raised by sufficient evidence." *State v. Derr*, 192 W.Va. at 181, 451 S.E.2d at 747 (citation omitted). "Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution." Syllabus Point 12, *Id.*

■ The trial court refused to give the proffered instructions because it found that there was insufficient evidence that Graham and Cassey were accomplices to the crime. After reviewing the record, we conclude that the trial court did not err by refusing to give the instruction. An essential

---

14. Another reason for the trial court's exclusion of the audiotape was the untimely disclosure of the tape. In their briefs to this Court, the parties argue the propriety of the exclusion of the tape on this basis. Because we find that the audiotape was properly excluded under Rule 613(b), we decline to address the disclosure issue.

15. The refused instructions were defendant's jury instructions 5, which concerned Lawrence Graham, and 6, which concerned Curtis Cassey. These instructions were as follows:

You, the Jury, are instructed that an accessory before the fact to a criminal act is one who was not present at the time of the commission

of the felony but who cooperated, assisted, aided or abetted in the perpetration of the offense.

Therefore, if from the evidence you find that [Lawrence Graham/Curtis Cassey] cooperated, assisted, aided or abetted in the transfer of morphine to the victim, Randall Burg [sic], you may find that she [sic] is an accessory before the fact to that crime; therefore, an accomplice to the act, and you should examine her [sic] testimony with great care and caution in determining what weight to give such testimony. *State v. Pettry*, [sic] 166 W.Va. 153, 273 S.E.2d 3346 [sic] (W.Va.1980)

element of the crime of accessory before the fact is knowledge. *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975). While an accessory before the fact,

> need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which, in the ordinary course of things, was the natural or probable consequence of the crime that he procured, advised or commanded, although such consequence may not have been intended by him.

*State v. Loveless,* 139 W.Va. 454, 463–464, 80 S.E.2d 442, 448 (1954) (quoting, in part, a jury instruction held to be not erroneous). Cassey's testimony indicates that he sold morphine to the defendant indirectly through Graham, who testified that he sold the morphine to the defendant because he knew the defendant "did pain drugs like [morphine]." Graham also testified that he witnessed the defendant inject himself with the morphine he purchased from Graham. While Cassey and Graham obviously knew that the defendant was purchasing the morphine in order to inject himself with it, there is no evidence they possessed the requisite knowledge that the defendant was going to deliver the morphine to another person in violation of W.Va. Code § 60A–4–401 (1983). Accordingly, we are unable to find that the trial court abused its discretion in refusing the proffered instructions.

### III.

### CONCLUSION

For the foregoing reasons, we find no merit in the assignments of error raised by the defendant. Accordingly, the judgment of the Circuit Court of Raleigh County is affirmed.

Affirmed.

Justice McGRAW did not participate in the decision of this case.