IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

No. 18-0498

**FILED**
**June 8, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

MICHAEL SHANE REXRODE,
Defendant Below, Petitioner

Appeal from the Circuit Court of Grant County
The Honorable Lynn A. Nelson, Judge
Case No. 17-MAP-1

AFFIRMED

Submitted:  May 20, 2020
Filed:  June 8, 2020

Jerry D. Moore, Esq.
Jared T. Moore, Esq.
The Moore Law Firm, PLLC
Franklin, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Mary Beth Niday, Esq.
Assistant Attorney General
Elizabeth Grant, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.
JUSTICE WORKMAN did not participate in the decision of this case.

SYLLABUS BY THE COURT

1.    "'Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative.' Syllabus Point 1, *State v. Moore,* 165 W. Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius,* 185 W. Va. 422, 408 S.E.2d 1 (1991)." Syl. Pt. 20, *State v. Ladd,* 210 W. Va. 413, 557 S.E.2d 820 (2001).

2.    Under the emergency doctrine exception to the warrant requirement, law enforcement officers may enter a home and conduct a limited search without a warrant when, considering the totality of the circumstances, they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. U.S. Const., amend. IV; W.Va. Const. art. III, § 6. To the extent that our prior holding in syllabus point two of *State v. Cecil*, 173 W. Va. 27, 311 S.E.2d 144 (1983), is inconsistent, it is expressly modified.

3.    "'When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular

i

deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.' Syllabus point 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996)." Syl. Pt. 1, *State v. Bookheimer*, 221 W. Va. 720, 656 S.E.2d 471 (2007).

4. "'In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.' Syllabus point 2, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996)." Syl. Pt. 2, in part, *State v. Bookheimer*, 221 W. Va. 720, 656 S.E.2d 471 (2007).

5. "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. Pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

6.      "Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." Syl. Pt. 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

7.      "'A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998)." Syl. Pt. 1, *State v. Timothy C.*, 237 W. Va. 435, 787 S.E.2d 888 (2016).

ARMSTEAD, Chief Justice:

Petitioner Michael Shane Rexrode was found guilty of one count of domestic battery of his wife in violation of West Virginia Code § 61-2-28(a) (2014) following a jury trial in the Magistrate Court of Grant County, West Virginia. By order entered May 24, 2018, the Circuit Court of Grant County affirmed this conviction and ordered that Petitioner serve the previously imposed sentence of ten days in jail.

On appeal to this Court, Petitioner raises numerous assignments of error. The primary issue presented is whether law enforcement officers' entry into Petitioner's home was reasonable under the emergency doctrine exception to the warrant requirement. U.S. Const., amend. IV; W.Va. Const., art. III, sec. 6. Under the circumstances presented, we conclude that it was. As such, this Court finds no error and affirms the circuit court's order.

## I. BACKGROUND

On April 19, 2017, at approximately 8:00 p.m., law enforcement officers responded to a 911 call from a third party who advised that that there was a domestic dispute underway at Petitioner's home.[1] The caller reported that Petitioner's wife, Suzette Rexrode, stated she was struck by her husband, Petitioner, and suffered an injury to her eye.

---

[1] The caller was later identified as a friend and neighbor of Mrs. Rexrode.

1

Corporal S.A. Nazelrod of the West Virginia State Police arrived at Petitioner's home in Maysville, West Virginia, at 8:26 p.m. Shortly thereafter, Deputies Rohrbaugh and Crites of the Grant County Sheriff's Department, arrived at the scene. As they approached the home, officers did not hear the couple arguing or shouting inside. Corporal Nazelrod knocked on the door and when Mrs. Rexrode greeted them, the officers immediately noticed that her right eye was bloody; specifically, blood was forming on the sclera.[2] She also had bloody injuries to her right arm. Mrs. Rexrode appeared "very visibly upset" but claimed that she injured herself on farm equipment earlier that day. Officers entered the home in order to locate Petitioner, secure the scene, separate the couple, and investigate the matter.

It is undisputed that officers did not have permission to enter the home, nor did they have either an arrest or search warrant. Corporal Nazelrod located Petitioner in the bedroom, lying on the bed under the covers. The officer told Petitioner to show his hands, to ensure Petitioner was not holding a weapon. When he complied, Cpl. Nazelrod noticed blood on Petitioner's hands. Petitioner was handcuffed and taken into the kitchen for questioning.

Meanwhile, Dep. Rohrbaugh stepped outside of the home with Mrs. Rexrode and asked her what happened. Mrs. Rexrode gave a statement to the officers at

---

[2] The sclera is the tough outer coating of the eyeball that is commonly called the "white part of the eye."

approximately 8:40 p.m., wherein she stated that Petitioner "jabbed me in the face with his fingers and fist." When asked what happened to her arm, Mrs. Rexrode replied: "He had me on the living room floor, holding me down and hitting me in the head."

Both Petitioner and Mrs. Rexrode were intoxicated that evening. Corporal Nazelrod chose not to interview Petitioner due to his level of intoxication.

The State filed a criminal complaint against Petitioner for one count of domestic battery. The criminal complaint, signed by Cpl. Nazelrod, stated:

> The defendant was detained for officer safety. The undersigned did then interview the victim, observing and photographing the injury to her eye, and an injury to her right arm, which appeared to be caused by being grabbed forcibly or restrained. The victim stated her and the defendant got into a verbal argument, and he proceeded to force her to the floor in the living room, and hold her down, striking her in the face with his fist, and jabbing at her eye with his fingers. The undersigned also observed a broken [I]ndian figurine in the living room where the incident occurred.
>
> The victim had to be transported to Grant [M]emorial Hospital for treatment due to her eye injury.
>
> The defendant was taken into custody and transported to Potomac Highlands Regional Jail to await arraignment.

Prior to trial, Petitioner filed a motion to dismiss the criminal charge, alleging that his warrantless arrest was unlawful. He also filed motions to suppress all evidence seized as a result of law enforcement's entry into the home, contending that the entry was illegal. In June 2017, the magistrate court held a suppression hearing, during which Cpl.

3

Nazelrod testified that he entered Petitioner's home "[f]or officer safety, also for – just to protect her and the other officers that were on scene." Ultimately, the magistrate court denied all of Petitioner's motions, finding that officers "not only acted lawfully, but appropriately, under the circumstances."

Petitioner's magistrate court jury trial was held in August 2017. The State presented testimony from Cpl. Nazelrod and Dep. Rohrbaugh concerning their arrival at Petitioner's home and investigation. Deputy Rohrbaugh testified that when Mrs. Rexrode "first came to the door she was very visibly upset and more or less distraught. She was kinda shaking as she spoke with us, and obviously I could see an injury to her eye at that point in time. That's whenever we first made initial contact with her[.]." The State introduced photographs that depicted Mrs. Rexrode's injuries, Petitioner's hands, and the broken figurine. The State also introduced Mrs. Rexrode's statement that was given to the officers that evening, wherein she reported that Petitioner "had her on the ground, more or less beating on her."

The State also called Mrs. Rexrode as a witness.[3] When asked about her statement to law enforcement on the evening in question, Mrs. Rexrode claimed it was "a lie." She stated that her injuries were caused by a fall in the house because she was "drunk." Contrary to her prior statement to law enforcement, Mrs. Rexrode testified that she hurt

---

[3] As discussed later in this opinion, Mrs. Rexrode attempted to invoke her Fifth Amendment privilege against self-incrimination but the magistrate ordered her to testify.

her eye when she fell over a step and landed on the figurine. After the magistrate court

denied Petitioner' motion for judgment of acquittal at the close of the State's case-in-chief,

Petitioner testified on his own behalf and denied the allegations against him. He explained

that he had blood on his hand that evening because of an injury sustained while working

earlier that day. Petitioner also stated that while his wife was intoxicated during the evening

in question, he had consumed only one beer. Ultimately, the jury found Petitioner guilty of

domestic battery and he was sentenced to ten days in jail.

Petitioner appealed his conviction to the circuit court, which held a hearing

in January 2018 and thereafter entered an order denying Petitioner's appeal on May 24,

2018.[4] The circuit court found that the officers' entry into Petitioner's home fell under the

exigent circumstances exception to the Fourth Amendment and, therefore, the officers

acted reasonably.[5] The circuit court found no merit to Petitioner's other assignments of

error.

---

[4] The court also stayed execution of Petitioner's sentence pending his appeal to this Court.

[5] In magistrate court, the State argued that the warrantless entry into Petitioner's home fell under the emergency doctrine. The State abandoned its reliance on this theory in circuit court, however, and argued that the warrantless entry was valid under the community caretaker doctrine. *See* Syl. Pt. 6, *Ullom v. Miller*, 227 W. Va. 1, 4, 705 S.E.2d 111, 114 (2010) ("The 'community caretaker' doctrine is a widely recognized exception to the general warrant requirement of the Fourth Amendment of the United States Constitution."). The circuit court found that the exigent circumstances exception applied.

## II. STANDARD OF REVIEW

On appeal, Petitioner argues that (1) the lower courts erred in finding the officers' entry into his home, and his subsequent arrest, fell within the emergency doctrine exception to the warrant requirement; (2) the magistrate court erred in consulting ex parte with the circuit court about an evidentiary issue during trial; (3) the magistrate court erred in forcing the victim to testify; (4) the State made prejudicial comments during closing argument; (5) the magistrate court erred in failing to record voir dire; (6) a State witness testified to inadmissible hearsay regarding the 911 call; (7) the circuit court failed to render a decision within the applicable timeframe; and (8) cumulative error. These assignments of error involve various legal principles and differing standards of review. Thus, we will address the applicable standard of review within the discussion regarding the assigned error.[6]

## III.  DISCUSSION

A. Emergency Doctrine Exception to the Warrant Requirement

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).[7] This Court has held:

---

[6] To provide more appropriate context to Petitioner's arguments, we address them in different order.

[7] The Fourth Amendment provides:

> "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution[8] —subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative." Syllabus Point 1, *State v. Moore,* 165 W. Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius,* 185 W. Va. 422, 408 S.E.2d 1 (1991).

Syl. Pt. 20, *State v. Ladd,* 210 W. Va. 413, 557 S.E.2d 820 (2001) (footnote added).

The presumption of unreasonableness, however, is not absolute. A warrantless entry by law enforcement may be justified by investigative exigencies or emergencies. *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006); *see Mincey v. Arizona,* 437 U.S. 385, 393-394 (1978) ("the exigencies of the situation [may] make the

---

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV.

[8] This Court has traditionally construed article III, § 6 of the West Virginia Constitution in harmony with the Fourth Amendment, because the language is very similar. *State v. Duvernoy*, 156 W. Va. 578, 582, 195 S.E.2d 631, 634 (1973).

needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.").[9]

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403. This exception to the warrant requirement, commonly referred to as the emergency doctrine, takes into account the fact that "police owe duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventative measures, and providing services on an emergency basis." *Merid v. Virginia*, No. 1145-19-4, 2020 WL 2374232, at \*3 (Va. Ct. App. May 12, 2020) (quotation marks and citation omitted).[10] A warrantless search or seizure undertaken on this basis passes constitutional muster, however, only if the officer had an objectively reasonable ground to believe that an emergency existed, and the manner of the entry and scope of the search were reasonable. *United States v. Najar*, 451 F.3d 710, 718 (10th Cir.

---

[9] *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (stating that the Fourth Amendment's central requirement is one of reasonableness).

[10] While technically distinct, the emergency doctrine is a specific example of the exigent circumstances doctrine. *People v. Chavez*, 240 P.3d 448, 451 (Colo. App. 2010). The doctrine of exigent circumstances requires the officers have traditional probable cause, while the emergency doctrine requires that the officers have an objectively reasonable basis for believing immediate assistance is required inside. *United States v. Snipe,* 515 F.3d 947, 951-53 (9th Cir. 2008).

8

2006). The notion of what is reasonable must "be fleshed out," on a case by case basis. *United States v. Banks*, 540 U.S. 31, 35-36 (2003).

In *State v. Cecil,* 173 W. Va. 27, 311 S.E.2d 144 (1983), we stated that, generally,

> the emergency doctrine may be said to permit a limited, warrantless search or entry of an area by police officers where (1) there is an immediate need for their assistance in the protection of human life, (2) the search or entry by the officers is motivated by an emergency, rather than by an intent to arrest or secure evidence, and (3) there is a reasonable connection between the emergency and the area in question.

*Id*. at 32, 311 S.E.2d at 149.

In syllabus point two of *Cecil*, this Court applied those factors to the specific facts of that case, concluding that the warrantless entry into the home was reasonable when police officers were attempting to locate an injured or deceased child based on information received immediately prior to the entry.[11] Considering the highly fact-driven inquiry in determining reasonableness, we recognized that the doctrine "has been defined in various

---

[11] *See* Syl. Pt. 2, *Cecil*, 173 W. Va. at 28, 311 S.E.2d at 146 ("Although a search and seizure by police officers must ordinarily be predicated upon a written search warrant, a warrantless entry by police officers of a mobile home was proper under the 'emergency doctrine' exception to the warrant requirement, where the record indicated that, rather than being motivated by an intent to make an arrest or secure evidence, the police officers were attempting to locate an injured or deceased child, which child the officers had reason to believe was in the mobile home, because of information they received immediately prior to the entry.").

ways and must be considered upon a case by case basis." *Id*. at 32, 311 S.E.2d at 149. [12]

Likewise, the United States Supreme Court has emphasized that reasonableness must be examined by "the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones." *Banks,* 540 U.S. at 36. Therefore, we cannot place hard parameters around the reasonableness inquiry; rather, each situation must be considered on its particular facts.

Although we believe that *Cecil* is a valid recognition of the emergency doctrine, we are compelled to modify its holding based upon subsequent precedent from the United States Supreme Court. The Supreme Court's decision in *Brigham City* calls into question the requirement expressed in *Cecil* that both the subjective motivation of a police officer and his or her action, viewed objectively, must be reasonable under the Fourth Amendment. *See* Syl. Pt. 2, *Cecil,* 173 W. Va. at 28, 311 S.E.2d at 146. Under the standard established by the United States Supreme Court in *Brigham City*, 547 U.S. at 404-05, we are not concerned with the subjective reasons for the officer's entry. Instead, we are to

---

[12] *See e.g., State v. Kimble*, 233 W. Va. 428, 759 S.E.2d 171 (2014) (permitting warrantless entry into home where law enforcement officers responded to report of shooting at the same location where law enforcement had previously responded to reports of defendant discharging firearms outside the home); *State v. Farley*, 230 W. Va. 193, 737 S.E.2d 90 (2012) (permitting warrantless entry into home when officers were given information that implicated defendant in an armed robbery; after announcing themselves at defendant's home, officers heard "rapid footsteps . . . through the house" and it was reasonable to believe defendant may have been armed and dangerous).

determine whether the police officer's "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.' *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 18 (1978) (emphasis added)." *Brigham City*, 547 U.S. at 404-05.[13]

We hereby hold that, under the emergency doctrine exception to the warrant requirement, law enforcement officers may enter a home and conduct a limited search without a warrant when, considering the totality of the circumstances, they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.[14] U.S. Const., amend. IV; W.Va. Const. art. III, § 6. To the extent that our prior holding in syllabus point two of *State v. Cecil,* 173 W. Va. 27, 311 S.E.2d 144 (1983), is inconsistent, it is expressly modified.

---

[13] In *Cecil*, this Court noted that "to justify the application of the emergency doctrine as an exception to the warrant requirement of the Fourth Amendment to the Constitution of the United States, both a subjective and an objective test must be met." 173 W. Va. at 32 n.10, 311 S.E.2d at 10 n.10. This statement is no longer a valid point of law in light of *Brigham City*.

[14] *Brigham City*, 547 U.S. at 404-05.

With this background to guide our analysis, we turn to the issue here: whether the warrantless entry into Petitioner's home fell within the emergency doctrine exception to the warrant requirement.

## B. Warrantless Entry into Petitioner's Home

Petitioner argues that the lower courts erred in finding that the warrantless entry into his home, and his subsequent arrest, fell within the emergency doctrine, because there was no showing that officers entered the home because they believed someone was inside who needed assistance.[15] Conversely, the State maintains that the officers entered the home without a warrant due to exigent circumstances, as they were concerned for their own safety as well as the victim's. Therefore, the State argues that the admissibility of the particular evidence was properly decided by the circuit court.[16]

We have previously set forth the following standard of review:

> "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the

---

[15] Petitioner does not assign as error the manner of entry or scope of the officers' search after they entered his home.

[16] The State also argues that the officers' entry was permitted under the community caretaker doctrine. *See supra* note 5. Because we find that the emergency doctrine applies, we do not address this other exception to the warrant requirement.

circuit court's factual findings are reviewed for clear error." Syllabus point 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

Syl. Pt. 1, *State v. Bookheimer*, 221 W. Va. 720, 656 S.E.2d 471 (2007). Additionally,

> "[i]n contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made." Syllabus point 2, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

221 W. Va. at 722, 656 S.E.2d at 473, syl. pt. 2, in part.

Specifically, Petitioner argues that the emergency doctrine does not apply because Cpl. Nazelrod's expressed intent in entering the home was to make an arrest. Petitioner focuses on Cpl. Nazelrod's testimony at the suppression hearing that he entered the home to "detain" Petitioner. But Cpl. Nazelrod never testified that he entered the home to make an arrest. A review of the testimony at the suppression hearing makes it clear that officers entered the home to secure the scene to assure the safety of Mrs. Rexrode and themselves.

> Q. [Pros. Atty. Ours] All right. When you arrived, how, did you locate her?
>
> A. [Cpl. Nazelrod] She came to the door.

13

Q. All right. So, what did you see when she came to the door?

A. A pretty bad injury to her eye. She also had blood injuries to her arms, things of that nature.

Q. All right. When you saw that, what did you do next and why?

A. Instantly had went to locate and detain Mr. Rexrode who she said was inside.

Q. What was the purpose?

A. For officer safety, also for – just to protect her and the other officers that were on scene.

Q. All right. When you went in the house, did you find him?

A. Yes.

Q. What did you see when you found him?

A. He was laying in the bed. I told him to show me his hands. He put his hands out for me. We got him out of bed, detained him. He had blood on his hands.

Petitioner argues that Cpl. Nazelrod did not testify that he perceived an immediate need for assistance in the protection of human life inside the home, and further argues that no one inside the home was in need of assistance because Mrs. Rexrode was standing at the door or on the porch when the officers entered. We disagree. Corporal Nazelrod stated emphatically at the suppression hearing that: "I was trying to stop people from hurting people. I was securing people at that point when I went into the residence." *See Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (recognizing that officers do not need

14

"ironclad proof" of a likely serious, life-threatening injury to invoke the emergency doctrine).

Because officers responded to a 911 call reporting domestic violence with injuries, we must consider the relevant law enforcement actions in this context. Domestic violence often, if not usually, occurs within the privacy of a home; these situations can be volatile and quickly escalate into significant injury to the victim and the officers called to the scene. "The volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). When police officers respond to a domestic dispute call, they understand that "violence may be lurking and explode with little warning." *Fletcher v. Clinton,* 196 F.3d 41, 50 (1st Cir. 1999). "Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Martinez*, 406 F.3d at 1164 (quotation marks and citation omitted).

As was the case here, "[o]fficers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Hiibel v. Sixth Jud. Dist. Ct. of Nev*., 542 U.S. 177, 186 (2004). Corporal Nazelrod testified at the suppression hearing that officers treat 911 calls of domestic violence as emergency situations and "typically respond in a hasty manner, try to locate the parties, get them separated, figure out what's going on." Even though Cpl. Nazelrod did not hear obvious signs of an ongoing domestic dispute

15

when approaching Petitioner's home, he recognized that: "It could've been occurring two seconds before I got there . . . . I don't know what was occurring when my car pulled in the driveway." In this regard, courts have recognized the combustible nature of domestic disputes as a compelling factor in determining whether a warrantless entry was justified, when, as in the case at bar, there is reasonable cause to believe that one of the parties to the dispute was in danger. *Tierney v. Davidson,* 133 F.3d 189, 197 (2d Cir. 1998).

At the same time, officers must respect basic freedoms guaranteed by the Fourth Amendment and article III, section 6 of the West Virginia Constitution, even when responding to reports of domestic violence. For instance, in *Brookheimer*, this Court found that the officers acted unreasonably when responding to an anonymous call of a domestic disturbance involving gunshots and yelling. 221 W. Va. at 724, 656 S.E.2d at 475. After officers arrived, the owner of the residence denied any domestic disturbance and there were no signs of dispute or injury. *Id*. Once officers learned that Mr. Brookheimer was inside, they entered the residence and found evidence of methamphetamine manufacturing in plain view. *Id*. On appeal, we held that the emergency doctrine did not permit officers to enter the residence because "neither resident . . . indicated a need for protection from the police." *Id*. at 727-28, 656 S.E.2d at 478-79.[17] However, the majority did indicate that "had facts

---

[17] As *Brookheimer* makes clear, there is no domestic violence exception to the Fourth Amendment. Thus, we agree with Petitioner's general assertion that "[t]he law does not give officers unfettered access to search and seize occupants of a home just because they are there for a domestic situation." *See United States v. Black,* 482 F.3d 1035, 1040 (9th Cir. 2007) ("we have stopped short of holding that domestic abuse cases create a per

been presented to suggest a possible domestic dispute, including injury or the presence of firearms, the resulting decision . . . may have been different." *Id*. at n.9

Here, in contrast to the facts in *Brookheimer*, when officers responded to the scene at Petitioner's residence, they observed Mrs. Rexrode's injuries which corroborated the earlier, specific, domestic violence report. Further, officers reasonably detected an immediate need for their assistance considering not only Mrs. Rexrode's injuries but also her "distraught" behavior. At this point, the officers had a duty to look behind her initial denials. *See Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1156 (N.J. 2000) (recognizing that victims of domestic violence are not always forthcoming with police); *see also Fletcher v. Town of Clinton,* 196 F.3d 41, 52 (1st Cir. 1999) ("In domestic violence situations, officers may reasonably consider whether the victim [in denying she or he is in danger] is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes."). Therefore, "[e]ven when the possible victim of domestic abuse assures the officer that she is in no danger, an officer is entitled to consider all the facts and is not required to take her statement at face value in assessing the potential threat of physical harm." *United States v. Lawrence,* 236 F. Supp. 2d 953, 963 (D. Neb. 2002).

---

se exigent need for warrantless entry") (quotation marks and citation omitted); *United States v. Davis,* 290 F.3d 1239, 1244 (10th Cir. 2002) (declining to "grant[ ] unfettered permission to officers to enter homes, based only upon a general assumption domestic calls are *always* dangerous"). Nonetheless, in reviewing police responses to emergency reports of ongoing domestic violence, courts must be cognizant of the difficulties such cases present for officers.

Viewing the evidence in the light most favorable to the prosecution, and considering the totality of the circumstances, we conclude that the officers' actions were objectively reasonable. They were confronted with circumstances demonstrating that Mrs. Rexrode, an occupant in the home, was seriously injured and imminently threatened. Thus, it was reasonable for officers to enter without a warrant, to assure the safety of Mrs. Rexrode and secure the scene for their own safety; indeed, the officers would have been derelict in their duty had they failed to take these actions. It would be patently unreasonable, and contrary to public safety, for officers to unquestioningly accept Mrs. Rexrode's initial denials and leave the scene with her wholly unprotected in the home from a potential abuser. "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties[.]" *Brigham City*, 547 U.S. at 406.

## C. Victim's Testimony

Mrs. Rexrode, the victim, did not want to testify against Petitioner at trial. After the State called her as a witness, she attempted to invoke her Fifth Amendment privilege against self-incrimination[18] upon the advice of her counsel, who was present, asserting that she did not want to open herself up to criminal prosecution for giving a false statement to law enforcement. As explained below, the magistrate court directed Mrs. Rexrode to respond to the State's questions. During her testimony, the prosecutor asked

---

[18] The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. 5.

about her statement to law enforcement on the evening in question, which Mrs. Rexrode claimed had been "a lie."

Petitioner argues that the magistrate court erred in forcing Mrs. Rexrode to testify by threatening her with contempt after she invoked her Fifth Amendment privilege against self-incrimination. Petitioner misrepresents the ruling below; at no point did the magistrate court threaten Mrs. Rexrode with contempt. While Mrs. Rexrode's attorney indicated that she would testify "under fear of being held in contempt," there is nothing in the record to indicate that the magistrate court judge ever said Mrs. Rexrode would be held in contempt if she refused to testify. More importantly, Petitioner cannot establish that the magistrate court erred in requiring Mrs. Rexrode to testify. After being sworn in and providing her name, Mrs. Rexrode was asked if she was married to Petitioner, at which point she asserted her Fifth Amendment privilege. Given that the answer to this question would not have incriminated her in any way, the assertion of the privilege against self-incrimination was inappropriate. *See* Syl. Pt. 2, in part, *State v. Herbert*, 234 W. Va. 576, 767 S.E.2d 471 (2014) ("The constitutional privilege against self-incrimination may only be invoked when a witness is asked a potentially incriminating question.").

In addition, the prosecuting attorney clearly stated that he informed Mrs. Rexrode's counsel that she would not be charged criminally as a result of any testimony she provided at Petitioner's trial. As the United States Supreme Court has held, a "witness may 'refuse to answer unless and until he is protected at least against the use of his

compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant.'" *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973)); *see also Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (stating Fifth Amendment privilege's protection extends only to witnesses who have reasonable cause to apprehend danger from a direct answer; "[t]hat inquiry is for the court; the witness' assertion does not by itself establish the risk of incrimination.").

Given Mrs. Rexrode's inappropriate attempt to invoke the Fifth Amendment privilege to a question that was not incriminating, and the State's express waiver of any potential criminal charges that could arise from her testimony, it is clear that the magistrate court did not err in directing her to testify.[19] Moreover, Petitioner cannot establish prejudice from the magistrate court's decision. Petitioner claims that the jury failed to believe Mrs. Rexrode's testimony after she was forced to testify, and that the magistrate's actions showed his partiality towards the State and bias against Petitioner. Both of these allegations are conclusory and purely speculative. Petitioner is not entitled to relief on appeal for an alleged violation of Mrs. Rexrode's rights.

---

[19] The record contains an extended discussion about the scope of Mrs. Rexrode's potential testimony and whether the magistrate court was directing her to answer all questions. Petitioner argues that the magistrate court ruled that Mrs. Rexrode was compelled to answer all questions, not just the limited question regarding her marital status. Regardless, given that her protection against prosecution was assured on the record, the scope of the magistrate court's ruling is immaterial on appeal.

20

D. Magistrate's Consultation with Judge

Petitioner also contends that he was denied a fair and impartial trial because the magistrate left the courtroom to consult with Circuit Court Judge James W. Courrier Jr., while an evidentiary dispute was ongoing concerning Mrs. Rexrode's attempt to invoke the Fifth Amendment privilege. Petitioner relies on Rule 2.9(A)(3) of the West Virginia Code of Judicial Conduct to argue that this communication was inappropriate. However, this reliance is clearly misplaced, as the rule plainly provides that "[a] judge may consult with . . . other judges, provided the judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility personally to decide the matter."

Petitioner cites to comment five of Rule 2.9, which provides that "[a] judge may consult with other judges on pending matters, but must avoid ex parte discussions of a case . . . with judges who have appellate jurisdiction over the matter." Petitioner argues that because the magistrate conferred with Judge Courrier—a circuit court judge from the circuit that had appellate jurisdiction over his case—he is entitled to relief. However, Petitioner ignores the fact that the circuit court specifically found, on appeal, that Judge Courrier "is not, under the 21st Circuit's case load rotation, the appellate judge for criminal appeals." Simply put, the rule upon which Petitioner relies prohibits discussions with a specific judge, one who has appellate jurisdiction over the matter in question, and the

21

record shows that Judge Courrier had no such jurisdiction.[20] Accordingly, Petitioner is entitled to no relief on this ground.

### E. Prosecutor's Remarks During Closing Argument

Petitioner next argues that the State made improper remarks during closing argument. During rebuttal closing, the State said of Mrs. Rexrode "[d]o any of you doubt that she is afraid about going home? . . . What do you reckon might happen to her if she goes home now after [Petitioner's] had to go through all this?" A timely objection for a mistrial was made and denied, and the court did not give a curative instruction. According to Petitioner, a prosecutor cannot argue for a conviction based upon the threat of a criminal defendant committing another crime in the future. *See Simmons v. South Carolina*, 512 U.S. 154, 163 (1994) ("Arguments relating to a defendant's future dangerousness ordinarily would be inappropriate at the guilt phase of a trial, as the jury is not free to convict a defendant simply because he poses a future danger; nor is a defendant's future dangerousness likely relevant to the question whether each element of an alleged offense has been proved beyond a reasonable doubt."). While we acknowledge this authority, we

---

[20] In further support of his claim that Judge Courrier did, in fact, have appellate jurisdiction over his criminal proceedings, Petitioner asserts that Judge Courrier entered the Order Granting Stay of Execution of Sentence. Petitioner ignores the fact that on the order staying his sentence, Judge Courrier indicated that he entered the order "for Judge Nelson."

22

find that under the facts and circumstances of this case, the prosecutor's remarks do not constitute reversible error.

This Court has held that: "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. Pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995). Further,

> [f]our factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Id*. at 393, 456 S.E.2d at 474, syl. pt. 6.

Applying these factors, we first note that the State's comments about Mrs. Rexrode were supported by the evidence, given her testimony that: "I have been scared to death this whole time because of the mess I've made. It's not only ruined my life, I haven't been home. I'm sorry." In light of Mrs. Rexrode's expressly stated fear of returning home, it is clear the State's comment was neither misleading nor unfairly prejudicial to Petitioner. Further, the State's comments were isolated, another factor which mitigates against reversal. Additionally, and critically, the State introduced substantial evidence to establish

23

Petitioner's guilt as the jury found. Finally, there is no evidence to indicate that these isolated comments were deliberately made to divert the jury's attention to an extraneous matter. We therefore find no reversible error.

## F. Voir Dire

The magistrate court did not record the entire voir dire portion of trial. "Generally, the failure to report some part of the proceeding will not alone constitute reversible error. Some identifiable error or prejudice must be shown by the defendant." *State v. Bolling*, 162 W. Va. 103, 115, 246 S.E.2d 631, 638 (1978). Petitioner claims that he cannot establish bias because of the failure to record that portion of the trial. However, we find that his challenges are reviewable despite the fact that a portion of voir dire was not recorded.

Specifically, Petitioner argues that the magistrate court expressed bias during voir dire by (1) expressing concerns that jury panel members were from Petitioner's hometown and could "know [and] like him;" (2) expressing displeasure with respect to the State's failure to strike a certain juror; and (3) failing to strike a prospective juror who was previously represented by the prosecuting attorney.

First, the magistrate court's comment that the jury pool consisted of people mostly from Petitioner's hometown *was* recorded. During discussions with counsel regarding the jury pool, the magistrate indicated that he "had some concerns" because

24

several potential jurors were from Petitioner's hometown and, with regard to at least one of these potential jurors, he did not know if it would affect the juror's ability to "sit and fairly judge" Petitioner's case. These remarks do not evidence bias on the magistrate's part; rather, they are very much in keeping with the court's duty to ensure an impartial jury. *See* Syl. Pt. 4, in part, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994) (citations omitted) ("The right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article III, Section 14 of the West Virginia Constitution.").

Likewise, Petitioner's final two claims regarding potential jurors do not exhibit bias on the part of the magistrate court or actual juror bias. According to Petitioner, the magistrate court "expressed displeasure" with the State's failure to strike one juror for cause when that juror indicated that he had previously been wrongly accused of domestic violence. Again, this simply indicates that the court sought to impanel an impartial jury. Petitioner finally argues that the magistrate court erred in failing to strike a prospective juror who was previously represented by the prosecuting attorney and that he is entitled to relief despite his use of a peremptory strike on this juror. We disagree. The circuit court found that this juror did not exhibit bias, given that her attorney-client relationship with the prosecutor was twenty years prior to the trial and the juror answered that she could be impartial. As this Court stated *State v. Miller,* 197 W. Va. 588, 476 S.E.2d 535 (1996), "[t]he trial court is in the best position to judge the sincerity of a juror's pledge to abide by the court's instructions; therefore, its assessment is entitled to great weight." *Id*. at 606, 476

S.E.2d at 553.[21] Based upon this Court's review of the issues raised concerning voir dire, we find no abuse of discretion by the lower courts.

## G. Officer's Testimony Regarding 911 Call

Petitioner also argues that the magistrate court committed error when Cpl. Nazelrod was permitted to testify to statements that constituted hearsay within hearsay regarding information conveyed from the 911 call. Petitioner claims the introduction of this testimony was especially egregious because the prosecuting attorney represented to the court that the testimony would not be introduced. Specifically, during trial, Cpl. Nazelrod was asked "[w]hat was the message you got when you were dispatched?" In responding, Cpl. Nazelrod said "[t]he message I got was --," at which point Petitioner objected, in anticipation of the witness indicating that the 911 caller reported a physical altercation at the home. Counsel and the court had a discussion outside the hearing of the jury, after which the State indicated that the witness would indicate only that he was dispatched for "a well-being check." However, when Cpl. Nazelrod resumed his testimony, he indicated

_____

[21] Moreover, had the record demonstrated that this potential juror was actually biased, Petitioner would not be entitled to relief because he failed to show prejudice. *See* Syl. Pt. 3, in part, *State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013) ("A trial court's failure to remove a biased juror from a jury panel, as required by W. Va. Code § 62-3-3 (1949) (Repl.Vol. 2010), does not violate a criminal defendant's right to a trial by an impartial jury if the defendant removes the juror with a peremptory strike. In order to obtain a new trial for having used a peremptory strike to remove a biased juror from a jury panel, a criminal defendant must show prejudice.").

26

that "[d]ispatch advised it was reported that there ha[d] been a physical altercation at the Rexrode --," at which point Petitioner again objected. The objection was overruled.

"'A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998)." Syl. Pt. 1, *State v. Timothy C.*, 237 W. Va. 435, 787 S.E.2d 888 (2016). Further, "[t]he hearsay rule excludes such testimony only when offered 'as evidence of the truth of the matter asserted'; and does not operate against such testimony offered for the mere purpose of explaining previous conduct." *State v. Maynard*, 183 W. Va. 1, 4, 393 S.E.2d 221, 224 (1990).

Petitioner argues that the officer's testimony constituted hearsay and was admitted solely for the purpose of establishing the truth of the matter asserted, i.e., that there was, in fact, a physical altercation at Petitioner's home. We disagree. A review of the record shows that this testimony was provided during Cpl. Nazelrod's explanation of how he came to be at Petitioner's home that evening. *See State v. Randolph*, 219 So.3d 425, 434 (La. Ct. App. 4 Cir. 2017) (stating police officer's testimony may include information provided by another individual without constituting hearsay when it is offered to explain

the course of the investigation or the officer's actions). We therefore find that the magistrate court did not abuse its discretion when admitting this evidence.[22]

## IV. CONCLUSION

For the reasons set out above, we affirm the order of the Circuit Court of Grant County upholding Petitioner's conviction of domestic battery.

Affirmed.

---

[22] Petitioner's remaining assignments of error merit little discussion. We reject the claim that Petitioner is entitled to relief due to the circuit court's delay in issuing its ruling. "This Court . . . succinctly explained . . . that 'where a nonconstitutional error has been asserted, we have adopted the rather general rule that the case will not be reversed unless the error is prejudicial to the defendant.'" *State v. White*, 223 W. Va. 527, 532, 678 S.E.2d 33, 38 (2009) (citation omitted). Although the circuit court failed to enter an order within ninety days, as required by West Virginia Code § 50-5-13(c)(6) (2016), Petitioner failed to establish prejudice sufficient to warrant reversal when he simply claimed to have suffered stress by not knowing whether his conviction would stand.

Finally, because we find no merit to any of his assignments of error, Petitioner is not entitled to relief on the ground of cumulative error. *See State v. McKinley,* 234 W. Va. 143, 167 n. 22, 764 S.E.2d 303, 327 n. 22 (2014) ("In order to invoke the cumulative error doctrine, there must be more than one harmless error.").